# fUNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| WRB, INC., | Case No. 21-CV-1899 (NEB/TNL) |
| Plaintiff, | |
| v. | ORDER ON MOTION FOR PRELIMINARY INJUNCTION |
| DAMM, LLC, MICHAEL NICHOLAS, DANIELLE NICHOLAS, MATTHEW RECK, and ALLISON RECK, | |
| Defendants. | |

WRB, Inc. moves for a preliminary injunction restraining DAMM, LLC and its owners from using the mark "Hammer-Schlagen" and the trade dress "Hammer-Schlagen" stump, cross-peen hammer, and nails, or similar marks which may confuse consumers under federal trademark infringement law. (ECF No. 5.) For the reasons below, the Court denies the motion.

## BACKGROUND

This dispute is over a German drinking game involving striking nails with a hammer into a stump of wood. The plaintiff WRB, which offers a version of the game at various festivals like Octoberfest, trademarked its version under the name "Hammer-Schlagen." The defendant DAMM claims that the rights to this type of game are not

exclusive to WRB and sells a different version of the game, called "Minneschlagen," in an at-home kit.

*WRB History*. According to the Complaint, in 1957, Carl Schoene immigrated to Minnesota from Germany, bringing with him a nail-driving game. (ECF No. 1 ("Compl.") ¶ 13.) Players of the game would drive nails into something by swinging an axe. (*Id.*) Schoene called the game "Nagelspiel"[1] and used it as a marketing tool for his family's restaurant. (*Id.* ¶¶ 14–15.) In the 1980s, Schoene's father-in-law, Mike Wlaschin, standardized the game. (*Id.* ¶ 16.) Wlaschin used cross-sections of cottonwood trees as the base and called the game "Hammer-Schlagen." (*Id.*) Wlaschin formed WRB in 1999 to offer Hammer-Schlagen as a service to the public—a game customers played at festivals and the like. (*Id.*¶¶ 18, 24–25.)

Hammer-Schlagen has been featured at the Northwest and Twin Cities Octoberfests.[2] (ECF No. 26 ¶¶ 2–4; ECF No. 27 ¶ 4.) It has also been promoted: in a 2020 City Pages article; on stickers featuring slogans; in Beer Dabbler and Growler Magazine; in paid Google adwords campaigns; and the stump, hammer, and nails appeared on the

---

[1] Nagelbalken is a traditional German game. (ECF No. 7 ("Martin Aff.") ¶10.)

[2] In its initial brief, WRB also claims Hammer-Schlagen has been featured at: LaCrosse and Iowa City Octoberfests; Gastof Zur Gemutlichkeit; Allianz Field, U.S. Bank Stadium, and Soldier Field; an American Cancer Society Fundraiser; and on Travel Channel's "Booze Traveler." (Pl's Br. at 3–4.) Though WRB claims that the facts in its brief are supported by the Affidavit of James Martin, (*id.* at 2 n.1 (citing Martin Aff.)), the affidavit provides no such support.

2015 Beer Dabbler flyer. (Martin Aff. ¶¶ 6–9.) The Hammer-Schlagen stumps WRB uses are large, often several feet in diameter, and the advertising is often orange, featuring a drawing of a cross-peen hammer and a nail. (Compl. ¶ 18; Martin Aff. ¶ 19.) WRB also alleges it has been selling Hammer-Schlagen kits to consumers since 1999, though it has not provided the Court with evidence supporting this claim. (Compl. ¶ 20.)

The United States Patent and Trademark Office registered "Hammer-Schlagen" just months after WRB applied for a trademark, in September 2015. (Martin Aff. ¶ 17; ECF No. 1-2.) The stump took longer; WRB applied for trade dress for "the stump" in 2015 and received the registration for "a three-dimensional configuration . . . comprising of a cylindrical cross-section of a tree with nails positioned around the outer circumference of its upward facing flat circular surface, and a cross-peen hammer" in August 2018. (Martin Aff. ¶¶ 13–14; ECF No. 1-1 at 2.)

*Minneschlagen.* DAMM, sells kits containing an at-home version of this game—or at least a similar game—under the name Minneschlagen. The Minneschlagen stump is smaller than the Hammer-Schlagen stump. (Martin Aff. ¶ 18 (describing Minneschlagen as "portable").) It comes in a crate with a small finishing hammer and a bag of nails. (*Id.* ¶¶ 19, 21.) The stump features the Minneschlagen logo—an outline of the state of Minnesota with "MINNESCHLAGEN" written in capital letters. (*Id.* ¶ 19.) DAMM applied for the mark "MINNESCHLAGEN" as a source identifier for a product: a game

including a stump, hammer, and nails. (ECF No. 22-1 at 2.) In December 2020, the U.S. PTO granted DAMM rights to "MINNESCHLAGEN." (*Id.*)

*German Language.* Though both "hammer"[3] and "schlagen" are German words, the parties disagree about whether the term "hammerschlagen" is a German word. (ECF No. 19 at 2, 6; ECF No. 25-1 at 2–10.) The "Hammer-Schlagen" trademark registration states that "the English translation of 'hammer-schlagen' . . . is 'hammer beating.'" (ECF No. 1-1 at 5.)

*Use in Social Media.* Regardless of its meaning in German, English-speaking Facebook users use "Hammer-Schlagen" to refer to a game; it is not clear whether the users are referring to the Hammer-Schlagen branded game or a more generic version. For example, in its Complaint, WRB submits a Facebook comment section that includes the comment, "It's called hammerschlagen where I have played it. Very entertaining to play!" (Compl. ¶ 48.) Another user posted pictures of players with a hammer and a stump on a private patio captioned, "Had #friends over to enjoy a game of #hammerschlagen."[4] (ECF No. 19 ("Def's Br.") at 4.) A self-described "Airbnb Superhost" posted pictures of a people gathered in a forest around a stump, nails, and hammers entitled

---

[3] The parties do not dispute that "hammer" refers to the same type of tool in German and in English.

[4] Both parties submitted images of social media posts within their briefing on this motion. The Court will consider these images despite the parties' failure to attest to their authenticity because neither party has objected to the images and because the parties have provided enough context for the Court to determine their sources.

"HAMMERSCHLAGEN 2021!" (*Id.* at 7.) And River Hops Brewing posted that it would have "Hammerschlagen . . . at Oktoberfest" with a picture of a beer stein, a stump (which is much smaller than the Hammer-Schlagen stump), a hammer, and two nails. (ECF No. 22-1 at 73.)

Although DAMM does not describe Minneschlagen as hammerschlagen, Tyler Winkey, a relative of a DAMM founder, allegedly described Minneschlagen as a "portable hammerschlagen set." (ECF No. 22-1 at 258–268 ("Nicholas's Aff.") ¶ 6; Compl. ¶ 40.) And some users have commented that Minneschlagen is a "knock off" of hammerschlagen or described it as hammerschlagen. (Compl. ¶ 48.)

*Google and Amazon Search Results.* DAMM submits evidence that a Google or Amazon search for "hammerschlagen" yields hammers, nails, and round pieces of wood—not just links to the WRB's product or site. (ECF No. 22-1 at 10–19, 118–126.)

*Alternatives to the stump.* Apparently, people also pound nails into other objects for fun. WRB submits several examples of people hitting nails into pieces of lumber as a game. (ECF No. 25-1 at 12–28.) These lumber-based games are likely cheaper to assemble than stump-based nail-pounding games. (ECF No. 22-1 at 94 ("The Hardest Thing About Hammerschlagen Is Scoring a Tree Stump").)

## ANALYSIS

### I.    Preliminary Injunction Standard

A court must consider four factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between this harm and the injury that granting the injunction will inflict on the other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). Preliminary injunctions are extraordinary remedies, and the party seeking such relief bears the burden of establishing its entitlement to an injunction under the *Dataphase* factors. *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003).

### II.    Success on the Merits

There are two protected marks at issue: WRB's trademark for the name "Hammer-Schlagen" and the trade dress of "the stump." To succeed on a trademark infringement claim, WRB will have to show (1) that it owns a property interest in the marks and (2) that there is a likelihood of consumers confusing its marks with Minneschlagen.[5] *Cmty. of*

---

[5] Plaintiff moves for a preliminary injunction under the Lanham Act and Minnesota's Deceptive Trade Practices Act ("DTPA"). (Pl's Br. at 17.) Because the DTPA "'mirrors' the Lanham Act," courts "use the same analysis to evaluate false advertising claims that are made simultaneously under the federal and state statutes." *Wing Enters., Inc. v. Tricam Indus., Inc.*, 511 F. Supp. 3d 957, 964 (D. Minn. 2021) (citation omitted). So this analysis applies to both Plaintiff's federal and state law claims.

*Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1009 (8th Cir. 2011).

As explained below, WRB has not established that it owns protectable marks for "Hammer-Schlagen" and the stump, hammer, and nails. Nor has WRB shown a likelihood of confusion. Thus WRB has not met its burden to prove its likelihood of success on the trademark infringement claims.

### A. Property Interest

Because WRB registered marks for "Hammer-Schlagen" and the stump, cross-peen hammer, and nails, it has established *prime facie* evidence that it owns protectable marks for each. 15 U.S.C. §§ 1057(b), 1115(a); *see Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 869 (8th Cir. 1994) (holding that the owner of registered marks was entitled to the presumption that the marks were valid). But DAMM presented sufficient evidence that consumers use both marks generically to rebut the *prime facie* case. 15 U.S.C. § 1064(3); *Anheuser-Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 638 ("[T]he test for deciding whether a word has become a generic title of a product or service is one of buyer understanding."). Thus a question of fact exists on how consumers use "Hammer-Schlagen" and how consumers identify the stump, hammer, and nails.

### 1. Trademark: "Hammer-Schlagen"

WRB argues that its registered and incontestable trademark for "Hammer-schlagen" is sufficient evidence of ownership, at least at this stage of litigation. A

trademark is "any word, name, symbol, or device or any combination thereof . . . used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods. . . ." 15 U.S.C. § 1127. "A trademark is not a monopoly on the use of a name or a phrase. Rather, the legal relevance of a trademark is to show the source, identity, sponsorship, or origin of the product." *Calvin Klein Cosmetics Corp. v. Lenox Lab'ys, Inc.*, 815 F2d 500, 503 (8th Cir. 1987) (citing *Prestonettes, Inc., v. Coty*, 264 U.S. 359, 368 (1924)).

A business does not acquire a trademark by registration. "[O]wnership rights flow only from prior appropriation and actual use in the market." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991) (citing J. McCarthy, Trademarks and Unfair Competition, § 16:5, at 733 (2d ed. 1984)). Registration of a mark is *prime facie* evidence of ownership and exclusive right to use the mark. 15 U.S.C. §§ 1057(b), 1115(a). And after continuous use of a registered trademark for five years, a registered trademark is ordinarily incontestable. *Id.* § 1065; *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000). When a trademark becomes incontestable, "registration shall be conclusive evidence of the registrant's exclusive right to use the registered mark," subject to certain conditions and enumerated defenses. 15 U.S.C. §§ 1115(b), 1065; *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). For example, an incontestable mark may be cancelled at any time if it becomes generic, if it has been abandoned, if it is

8

used to misrepresent the source of goods, or if it was obtained fraudulently. 15 U.S.C. §§ 1064, 1115(b), 1119; *Park 'N Fly*, 469 U.S. at 195.

WRB has a registered incontestable mark in "Hammer-Schlagen," which is conclusive proof of ownership, and WRB "may rely on incontestability to enjoin infringement."[6] *Park 'N Fly*, 469 U.S. at 205. So DAMM must show the mark is cancellable to refute ownership. *Id.* at 202 ("A mark may be canceled at any time for certain specific grounds.") (citing 15 U.S.C. § 1064).

DAMM presented evidence that consumers use "Hammer-Schlagen" generically, which is grounds for cancellation under the Lanham Act. 15 U.S.C. §§ 1064(3), 1119. To support this contention, DAMM presented Facebook posts referring to homemade stump games as "hammerschlagen," results from a Google search for "hammerschlagen" that have nothing to do with WRB, and similar results from an Amazon search. (Def's Br. at 4, 7–8; ECF No. 22-1 at 67–74.) The Google and Amazon search results depend on an algorithm and so their significance is not clear, but the Facebook posts suggest generic use, at least by some consumers.[7] Though DAMM could have presented better evidence

---

[6] Although WRB did not submit the certificate of incontestability to the Court, DAMM does not dispute that the mark "Hammer-Schlagen" is incontestable, so the Court assumes it is for this analysis.

[7] WRB asks the Court to consider these Facebook posts as evidence of confusion—that consumers are confusing WRB's brand with DAMM. This may be so, but the parties have not presented evidence resolving the dispute over the meaning of these posts, so a question of fact remains.

of generic use,[8] these posts suggest at least a factual dispute over whether consumers use "Hammer-Schlagen" generically. *See, e.g., Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1121 (D. Minn. 2000) (noting a factual dispute over likelihood of conclusion and denying injunctive relief). Given the record at this stage, the Court cannot conclude that WRB is likely to succeed on the merits as to ownership. Thus, WRB has not shown it is likely to succeed on the merits as to its ownership of the trademark "Hammer-Schlagen."

   2.   *Trade Dress: The Stump, Cross-Peen Hammer, and Nails*

   WRB argues its trade dress registration for the stump, cross-peen hammer, and nails show it owns the mark. Trade dress is a trademark in a product's overall appearance. *Aromatique*, 28 F.3d at 868; *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 237 F. Supp. 3d 1230, 1235 (M.D. Fla. 2017). It does not replace other intellectual property protections; rather, trade dress protection prevents a new seller from riding the coattails of an existing seller's reputation and goodwill. *Yellowfin Yachts*, 237 F. Supp. 3d at 1235. As with trademarks, owners may register trade dress under the Lanham Act. *Wal-Mart*, 529 U.S. at 209.

   Generally, to prove protectability of trade dress a plaintiff must show that (1) the claimed trade dress is nonfunctional and that (2) the claimed trade dress is distinctive.

---

[8] For example, at the hearing on this motion, DAMM's counsel presented a compelling story about a groom building his own "hammerschlagen" game for his wedding reception. Without an affidavit to support the story, the Court cannot consider this anecdote.

*Aromatique*, 28 F.3d at 874 ("The trade dress at issue here is invalid for two independent reasons: it is not distinctive and it is functional.") "Registered marks . . . are presumed to be distinctive and nonfunctional," but a party can overcome that presumption with evidence presented by the defendant that the trade dress is either generic or functional. *Id.* at 869.

*Functionality*. First, WRB must show it is likely to show the stump is nonfunctional. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995). A functional feature is generally "essential to the use or purpose of the [product] or . . . affects the cost or quality" of the product. *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 850 n.10 (1982).

"The line between functionality and nonfunctionally is not . . . brightly drawn in every case." *Truck Equip. Serv. Co. v. Fruehauf Corp.*, 536 F.2d 1210, 1218 (8th Cir. 1976).

> Where a shape or feature of construction is in its concept arbitrary, it may be or become a legally recognizable trademark because there is no public interest to be protected. In such a case protection would not be lost merely because the shape or feature also serves a useful purpose.

*Id.* (citation omitted). Aesthetic features can be non-functional. *See Wal-Mart*, 529 U.S. at 213–14 (explaining that aesthetic features can be distinctive if they identify the maker as the source of the product). But where the design's aesthetic function confers a significant benefit that another design cannot practically duplicate, the design is functional. *See*

*Premium Balloon Accessories, Inc. v. Creative Balloons Mfg., Inc.*, 573 Fed. App'x 547, 554 (6th Cir. 2014) (citing *Qualitex*, 514 U.S. at 170) (finding that a star-shaped balloon weight was functional when it matched a star-shaped balloon).

WRB registered the trade dress for the Hammer-Schlagen stump, so the Court presumes the stump non-functional. *Aromatique*, 28 F.3d at 869. Thus DAMM must produce evidence that the stump, hammer, and nails are functional. DAMM alleges that the components of WRB's "Hammer-Schlagen" are functional so the whole trade dress is functional. (Def's Br. at 14.) But trade dress is the "total image of a product, the overall impression created, not the individual features," so the Court will not consider the functionality of the stump, cross-peen hammer, and nails separately in evaluating functionality. *Aromatique*, 28 F.3d at 868 (citation omitted). And given the many other nail-pounding games that use other shapes of wood, WRB will likely be able to show that the stump shape itself is aesthetic. Given the presumption in WRB's favor and because DAMM presents no evidence to rebut such a finding, WRB has established that it is likely to show that its trade dress of the stump is non-functional.

*Distinctiveness.* Second, WRB must show the mark is distinctive—that it is not generic. "A distinctive trademark is one that is capable of identifying the source of goods because it is either inherently distinctive or, if not inherently distinctive, has acquired

distinctiveness by acquiring secondary meaning."[9] *Aromatique*, 28 F.3d at 869. Trade dress must be distinctive because "[g]ranting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." *Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 593 (E.D.N.Y. 2017) (citing *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997)). "A mark has acquired distinctiveness . . . if it has developed a secondary meaning, which occurs when, in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart*, 529 U.S. at 211 (cleaned up, citation omitted). In contrast, "[a] generic mark refers to the article or service it identifies by its common name and is not entitled to protection." *Co–Rect*, 780 F.2d at 1329.

WRB is entitled to a strong presumption of secondary meaning (and thus acquired distinctiveness) because the U.S. PTO already determined the mark has secondary meaning. *See Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 884 (8th Cir. 2014) (finding a strong presumption of validity, including a presumption that the marks had secondary meaning, for a mark registered under 15 U.S.C. § 1052(f)). "The mere fact that the public sometimes uses a trademark as the name for a unique product does not

---

[9] There are two categories of distinctive marks: those that are inherently distinctive and those that have acquired distinctiveness. *Aromatique*, 28 F.3d at 869. WRB does not argue that the stump, cross-peen hammer, and nails are inherently distinctive, so the Court only discusses "acquired distinctiveness." (*See* Pl's Br. at 20–21 (arguing only acquired distinctiveness).)

immediately render the mark generic." *Elliott v. Google, Inc.*, 860 F.3d 1151, 1159 (9th Cir. 2017) (citing 15 U.S.C. § 1064(3)); *cf. Lovely Skin*, 745 F.3d at 885 (holding that evidence of third parties that had registered trademarks like Lovely Skin's trademarks "cannot overcome the strong presumption of validity and establish a *prima facie* case that Lovely Skin's marks had not acquired distinctiveness at the time of their registrations . . . .").

DAMM must present evidence showing that "the primary significance of the registered mark to the relevant public" is to name the good itself, not the source. *Elliott*, 860 F.3d at 1156, 1159 (citation omitted); *see Anheuser-Busch, Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 638 (8th Cir. 1984) ("The test for deciding whether a word has become a generic title of a product or service is one of buyer understanding.") (citation omitted). DAMM presents sufficient evidence that consumers use "hammerschlagen" and "the stump" to name and identify a game not associated with WRB, which suggests that DAMM will be able to meet this burden.

WRB points to evidence of acquired distinctiveness through promotions and features in magazines. (Pl's Br. at 20.) But at least one of those features does not identify WRB or "Hammer-Schlagen" in any way. The 2015 Beer Dabbler flier features the stump, hammer, and nails but no WRB or "Hammer-Schlagen" logo, (Martin Aff. ¶ 7), so it is as likely the flyer is evidence of generic use as of acquired distinctiveness.[10]

---

[10] WRB identifies several other features of "Hammer-Schlagen" but does not submit evidence that supports acquired distinctiveness by showing secondary meaning. (Pl's Br.

Finally, WRB submits declarations from coordinators of the Twin Cities and Northwest Oktoberfests that most attendees would associate "the round stump with nails around the perimeter and a cross-peen hammer" with WRB's game design. (ECF Nos. 26 ¶¶ 2, 6; ECF No. 27 ¶¶ 2, 6; *see* ECF No. 24 ("Pl's Reply") at 13.) But the Court does not consider only the impressions of those familiar with the trade. *See Anheuser-Busch*, 750 F.2d at 638 ("The test, however, is what consumers, not persons in the trade, understand the term to be."). So the Court finds these affidavits less compelling than the direct evidence of consumer use.

On this record, WRB has not shown it will likely prove it owns trade dress for the stump, cross-peen hammer, and nails.

### B. *Likelihood of Confusion*

Even if WRB had successfully shown ownership, it would not succeed on this motion because WRB has not established that DAMM's use is likely to create confusion in the marketplace. *See Homeowners Grp.*, 931 F.2d at 1106 (analyzing a trademark dispute between two parties with registered marks).

Courts consider the *SquirtCo* factors to determine the likelihood of confusion between a trademark and an allegedly infringing mark: (1) the strength of the trademark; (2) the similarity between the trademark and the alleged infringing mark; (3) the degree

---

at 4 (describing WRB features at sports games and fundraising events, among others, and on TV).)

of competition between the allegedly infringing mark and the trademark owner; (4) "the alleged infringer's intent to confuse the public; (5) the degree of care reasonably expected of potential customers; and (6) evidence of actual confusion." *Cmty. of Christ*, 634 F.3d at 1009 (citing *SquirtCo. v. Seven–Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). The plaintiff bears the burden of proving that a likelihood of confusion exists, even for an incontestable mark. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 118 (2004). Thus, to succeed on the merits, WRB must show that the *SquirtCo* factors support a finding that DAMM's use creates a likelihood of confusion. As discussed below, it cannot.

1. *Strength of WRB's Marks*

The strength of WRB's marks rests on the distinctiveness of the marks, so the Court must ask if either mark has a "secondary meaning" to consumers—a meaning that identifies WRB. *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 1008 (C.D. Cal. 2011); *cf. Lovely Skin*, 745 F.3d at 888 (explaining that mark strength relates to descriptiveness and secondary meaning). A descriptive mark is the "weakest protectable mark." *Lovely Skin*, 745 F.3d at 888 (citation omitted). So a plaintiff has "a heavy burden" to show a descriptive mark has strong secondary meaning. *Id.* As discussed above, WRB's marks are at best distinctive, and DAMM presents sufficient evidence to raise a question of fact about whether consumers use "Hammer-Schlagen" or the stump for a secondary meaning that does not identify WRB. Thus, this factor weighs against finding likelihood of confusion at this stage of litigation.

2. *Similarity of the Marks*

To show similarity, WRB must show that its marks and DAMM's marks are likely to confuse consumers. Courts look at "the overall impression created by the marks"—their total effect—to determine whether marks are similar. *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987).

WRB has not satisfied its burden to show that "Minneschlagen" and "Hammer-Schlagen" are confusingly similar. As DAMM's counsel demonstrated at the hearing on this motion, Minneschlagen is sold in a wood crate with rope handles, and the crate disassembles to reveal a small (10–14 inch) stump, a small finishing hammer, and a bag of nails. The Minneschlagen logo—"Minneschlagen" written over an outline of the state of Minnesota—features prominently on the stump and the bag of nails. In contrast, at the hearing on this motion, Counsel for Hammer-Schlagen explained that Hammer-Schlagen sets up large stumps, with large cross-peen hammers, and nails, under tents at events. At these events, WRB passes out stickers with innuendo such as, "I Got Nailed" and "Got Wood?" (Martin Aff. ¶ 6.) Its advertising is in orange with block letters and a drawing of a hammer. (*E.g.*, Pl's Br. at 5; Compl. ¶ 18; Martin Aff. ¶ 19.) Each leaves a consumer with a different first impression—DAMM's suggests a homey, Minnesota game for any occasion, and WRBs is a rugged, spirited, outdoor party game. *See Gen. Mills*, 824 F.2d at 627 (upholding a district court's analysis comparing "color schemes, lettering style, and box designs" in evaluating the overall impression).

17

WRB argues that the names "Hammer-Schlagen" and "Minneschlagen" are confusingly similar. Although they both include the term "schlagen," "[t]he use of identical, even dominant, words in common does not automatically mean that two marks are similar." *Gen. Mills*, 824 F.2d at 627. And the parties do not dispute that "schlagen" means to "strike" in German. (*See* Def's Br. at 6 (asserting that "hammerschlagen is a German word that may loosely mean 'to strike with a hammer'"); Pl's Reply at 4 ("'Schalgen' means the action of striking").) The Court will not find names to be confusingly similar where the only similarity is a word in a foreign language. *Cf. In re Cordua Restaurants, Inc.*, 823 F.3d 594, 603 (Fed. Cir. 2016) ("[A] foreign equivalent of a generic English word is no more registrable than the English word itself.").

Finally, WRB argues the trade dress for the Hammer-Schlagen stump and Minneschlagen undeniably both involve a stump, hammer, and nails and their products are sold in similar markets, so they are confusingly similar. Courts presume likelihood of confusion when substantially similar marks in the same category of goods or services are used in the same geographical area. *See Solutech, Inc. v. Solutech Consulting Servs., Inc.*, 153 F. Supp. 2d 1082, 1088 (E.D. Mo. 2000) (presuming likelihood of confusion "when identical marks are used in the same geographic area for the same class of goods or services"); *Cmty. of Christ*, 634 F.3d at 1009–10 (noting likelihood of consumer confusion where defendant used "identical or substantially similar marks while offering the same category of services in the same geographical location"). WRB sells its service (and not a

take-home game) at the Twin Cities Oktoberfest, while Minneschlagen targets Minnesota consumers with its name and the outline of the state of Minnesota on the packaging. But even in Minnesota markets, consumers will not likely be confused by the similarities given the differences in overall impression and because WRB sells a service and DAMM sells a product.

### 3. *Degree of Competition*

When two companies' products are closely related, consumers are more likely to confuse their products. *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010). Though both WRB and DAMM sell in the same geographic area, they sell in distinct markets. DAMM sells a product for use at home, and WRB sells a service—a game played at an event. This competitive separation suggests consumers are unlikely to confuse the two, and so this factor favors DAMM.

### 4. *Intent to Confuse*

DAMM's knowledge of WRB's product does not show DAMM intended to confuse consumers. *See Gen. Mills*, 824 F.2d at 627 ("Knowledge of another's product and an intent to compete with that product is not . . . equivalent to an intent by a new entrant to a market to mislead and to cause consumer confusion."). The Eighth Circuit has held that evidence an infringer deliberately copied a mark might not establish intent to confuse

when the copy "clearly represents to the ultimate consumer that [it] manufactures its own products." *Children's Factory, Inc. v. Benee's Toys, Inc.*, 160 F.3d 489, 495 (8th Cir. 1998).

Minneschlagen and Hammer-Schlagen both include "schlagen," which, according to WRB, suggests that DAMM meant to create "a geography-specific version of WRB's trade dress." (Pl's Br. at 28.) But, as noted above, the parties do not dispute that "schlagen" means "to strike" in German, (Def's Br. at 6; Pl's Reply at 4), so it is also possible that Minneschlagen referenced the German meaning.

And Minneschlagen features its own logo prominently, which suggests DAMM's intent to represent its own brand to consumers and not to copy. *Children's Factory*, 160 F.3d at 495. Though there are similarities between WRB's and DAMM's marks, DAMM added packaging and offers a portable size, which suggests DAMM intended to have a different appearance from WRB's game. Thus, WRB has not demonstrated an intent to confuse.

5. *Degree of Care by Consumers*

If WRB can show consumers exercise a low degree of care in selecting a "Hammer-Schlagen" game, that supports finding likelihood of confusion. *See SquirtCo.*, 628 F.2d at 1089–90 (upholding District Court finding that consumers exercise low degree of care). In analyzing the degree of care, the Court should stand "in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Gen. Mills*, 824 F.2d

at 627 (quotation marks and citation omitted). The Eighth Circuit has held that "even if the products are comparably priced" to each other, the more expensive a product is, the "more apt" consumers will be to "concentrate on the representations of quality and price, rather than on source." *Children's Factory*, 160 F.3d at 496.

WRB charges much less for its service than DAMM charges for its product. According to WRB, the average Hammer-Schlagen consumer is "someone going to a bar, an outdoor festival, or an Octoberfest celebration and spending a couple of dollars," and so WRB would have the Court find that a consumer is not taking special care to determine the source of a product. (Pl's Br. at 31.) Minneschlagen's evidence of price is that it is "the equivalent of 8 cases or more of low-cost beer." (Def's Br. at 28.) Due to this apparent difference in price, DAMM believes consumers will discern competing games. (Def's Br. at 28.) When consumers contemplate buying either WRB's service or DAMM's product, the price difference might prompt investigation. But the Court cannot conclude this factor weighs on either side.

### 6. *Evidence of Actual Confusion*

"[W]hile actual confusion is not essential to a finding of infringement, its existence is positive proof of the likelihood of confusion." *Northland*, 115 F. Supp. 2d at 1121 (citing *SquirtCo.*, 628 F.2d at 1091). WRB asks the Court to consider the Facebook posts as evidence of actual confusion. (Pl's Reply at 22.) And they may be. But they may also be evidence that consumers use the term "hammerschlagen" and the stump generically, so

21

a question of fact remains. WRB also submits declarations from two Oktoberfest coordinators who attest that they "*would have* assumed Minneschlagen's product is affiliated with WRB." (ECF No. 26 ¶ 8 (emphasis added); ECF No. 27 ¶ 8 (same).) This suggests some consumers might be confused, but it does not establish actual confusion because the coordinators themselves were not confused nor do they report knowing of attendees who were confused. Thus, WRB has not presented sufficient evidence of likelihood of confusion to succeed at this stage of litigation.

## III.     Threat of Irreparable Harm

In 2020, Congress amended the Lanham Act to add that a plaintiff seeking a preliminary injunction "shall be entitled to a rebuttable presumption of irreparable harm upon a finding of . . . likelihood of success on the merits."[11] Amending Lanham Act, Pub. L. No. 116-260, § 221(a), 134 Stat. 1182 (2020) (amending 15 U.S.C. § 1116(a)). Congress's

---

[11] This amendment makes clear that the Supreme Court's holding in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), does not apply to patent cases, so the Court cannot extend its holding to trademarks, though DAMM argues for it. (Def's Br. at 36.) The *eBay* Court ruled that such a presumption should not be applied in patent cases. 547 U.S. at 392–93. Several circuits had extended *eBay* to other infringement cases. *Ferring Pharms. Inc. v. Watson Pharms. Inc.*, 765 F.3d 205, 216 (3d Cir. 2014); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013); *see also N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228–29 (11th Cir. 2008). The Eighth Circuit had not adopted this approach. *See Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (explaining that it is "unclear whether the traditional presumption of irreparable harm in trademark cases has survived more recent Supreme Court opinions emphasizing the movant's burden to show that 'irreparable injury is likely in the absence of an injunction.'") (citations omitted). Congress resolved the conflict, so the Court applies the Lanham Act with its presumptions.

amendment tracks the law in this circuit that "injury [in a trademark infringement case] is presumed once a likelihood of confusion has been established." *Cmty. of Christ*, 634 F.3d at 1012. Thus, courts can presume irreparable harm if likelihood of confusion has been established. *Gen. Mills*, 824 F.2d at 625. Actual demonstrated confusion is not required to show irreparable harm because monetary compensation cannot restore goodwill and reputation. *Advantus Cap. Mgmt., Inc. v. Aetna, Inc.*, No. 06–CV–2855 (JMR/FLN), 2006 WL 2916840, at *5 (D. Minn. Oct. 11, 2006).

WRB urges the Court to find irreparable harm to its goodwill and reputation. (Pl's Reply at 24–25.) But because WRB "at best has shown that a factual question exists" about whether a consumer will likely be confused, there is no presumption of irreparable harm. *Northland*, 115 F. Supp. 2d at 1117. Without that presumption, the Court does not find irreparable harm. Harm to WRB from "loss of control" over "Hammer-Schlagen" and the trade dress would stem from consumer confusion (*i.e.*, WRB only loses control over its brand if consumers think DAMM's product is WRB's or vice versa). But because WRB has not shown it is likely to succeed on showing consumer confusion, the Court also concludes that WRB has not met its burden to prove irreparable harm.

## IV. Balance of Harm

The next *Dataphase* requirement is that the harm to WRB without a preliminary injunction outweighs any harm of granting an injunction. WRB failed to address this point, focusing only on the irreparable harm it might face without an injunction. (Pl's Br.

at 32–33; Pl's Reply at 24–25.) WRB offers no evidence of a decrease in sales or actual harm. In contrast, a preliminary injunction would require that DAMM stop selling its products. (Def's Br. at 37.) And at the hearing on the motion, DAMM's counsel suggested this may put DAMM out of business. On the record before the Court, the balance of the harms weighs against a preliminary injunction.

## V.   Public Interest

The final *Dataphase* factor considers the public interest. *Dataphase*, 640 F.2d at 114. The parties present competing public interests to support their positions. WRB argues the public interest is best served by an injunction because of the strong public interest in protecting trademark rights. (Pl's Br. at 33.) DAMM counters that the public interest values legitimate competition. (Def's Br. at 39.) Trademark law always balances these interests. *Landscape Forms*, 113 F.3d at 377. At this stage, there is a third interest: public policy requires that preliminary injunctions be granted only in extraordinary circumstances. *Watkins*, 346 F.3d at 844.

Since factual questions exist as to whether WRB owns protectable marks in "Hammer-Schlagen" and the stump, cross-peen hammer, and nails and as to whether a consumer would likely be confused about the differences between WRB's and DAMM's marks and products, the public interest is best served by preserving the status quo. *See Nat'l Basketball Ass'n v. Minn. Pro. Basketball, Ltd. P'ship*, 56 F.3d 866, 871–72 (8th Cir. 1995) (providing that the primary purpose of a preliminary injunction is to preserve the status

quo until the court reaches the merits). Without a clearer showing of irreparable harm and likelihood of success on the merits, the Court will not grant such an extraordinary remedy.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, the motion for a preliminary injunction (ECF No. 5) is DENIED.


Dated: January 14, 2022                   BY THE COURT:

                                          s/Nancy E. Brasel
                                          Nancy E. Brasel
                                          United States District Judge