## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| WRB, Inc., doing business as Hammer-Schlagen, | Case No. 21-cv-1899 (NEB/TNL) |
| Plaintiff/Counter Defendant, | |
| v. | **ORDER** |
| DAMM, LLC, doing business as Minneschlagen; Michael Nicholas; Danielle Nicholas; Matthew Reck; and Allison Reck, | |
| Defendants/Counterclaimants. | |

Chad A. Snyder and Michael H. Frasier, Rubric Legal LLC, 111 Third Avenue South, Suite 110, Minneapolis, MN 55401 (for Plaintiff/Counter Defendant); and

Cassandra B. Merrick and Christopher W. Madel, Madel PA, 800 Hennepin Avenue, Suite 800, Minneapolis, MN 55403; and Paul T. Dietz, Dietz Law Office LLC, 4975 Wilderness Lake Circle, Elko New Market, MN 55020 (for Defendants/Counterclaimants).

## I. INTRODUCTION

This matter comes before the Court on the following motions: (1) Defendants/Counterclaimants DAMM, LLC, Michael Nicholas, Danielle Nicholas, Matthew Reck, and Allison Reck's (collectively, "DAMM Defendants") Motion to Compel Discovery, ECF No. 43; (2) Plaintiff/Counter Defendant WRB, Inc.'s Motion to Compel, ECF No. 50; and (3) the DAMM Defendants' Motion for Leave to Amend Their Answer and Counterclaims, ECF No. 63.

1

## II. DISCOVERY MOTIONS

### A.  Background

The Court previously noted that "there [we]re close to 120 disputed discovery requests in these two motions to compel."  ECF No. 60 at 2.  The Court continued the hearing on these motions and directed the parties to "continue meeting and conferring regarding the copious amount of discovery in dispute."  ECF No. 60 at 1-2.  The Court directed the parties to jointly complete a chart identifying the discovery at issue; the parties' positions on the discovery requests; and each party's last offer in compromise.  As the Court previously stated, "[i]n the Court's experience, this exercise has often had the practical and laudable effect of assisting both the parties and the Court in efficiently addressing the disputed discovery and narrowing any remaining issues."  ECF No. 60 at 2.  Unfortunately, as of the hearing, this exercise did not have the desired impact and roughly 100 discovery requests remained.

Following the hearing, the parties renewed their efforts at "attempting to resolve [the] discovery disputes that [we]re the subject of the parties' cross motions to compel."  ECF No. 91 at 1.  The parties were directed to "file a joint letter on or before September 19, 2022 indicating which if any of the discovery requests at issue in [these motions to compel] have since been resolved."  ECF No. 93.

The parties' efforts were not in vain.  The parties were able to resolve all of the discovery at issue in WRB's motion to compel and were able to narrow at least somewhat

the discovery at issue in the DAMM Defendants' motion.[1]  Most recently, the DAMM Defendants notified that Court that, after taking depositions in this matter, they were able to additionally narrow the remaining requests at issue.  *See generally* ECF No. 100.

### B.  WRB's Motion to Compel

In light of the parties' joint letter that the discovery at issue in WRB's motion to compel has since been resolved, this motion will be denied as moot.

### C.  DAMM Defendants' Motion to Compel

Following the parties' repeated meet-and-confers, there remain a little over 20 discovery requests at issue.  They are as follows: Defendant Allison Reck's ("AR") Request for Production No. 7; Defendant Danielle Nicholas's ("DN") Request for Production Nos. 4, 5, and 7; Defendant Michael Nicholas's ("MN") Request for Production Nos. 11 and 12; Defendant Matthew Reck's ("MR") Request for Production Nos. 4, 5, 6, 7, 11, and 12; Defendant DAMM, LLC's Request for Production Nos. 11 and 12; Defendant DAMM, LLC's Interrogatory Nos. 9 and 10; and Defendant DAMM, LLC's Request for Admission Nos. 6, 9, 11, 17, 22 and 24.

#### 1.  Legal Standard

The DAMM Defendants' motion implicates the Court's broad discretion in handling pretrial procedure and discovery.  *See, e.g.*, *Hill v. Sw. Energy Co.*, 858 F.3d 481, 484 (8th Cir. 2017) ("A district court has very wide discretion in handling pretrial discovery . . . ." (quoting *United States ex rel. Kraxberger v. Kansas City Power & Light Co.*, 756 F.3d

---

[1] Rather than file the joint letter, the letter was sent to the chambers of the undersigned via e-mail.

1075, 1082 (8th Cir. 2014)); *Solutran, Inc. v. U.S. Bancorp*, No. 13-cv-2637 (SRN/BRT), 2016 WL 7377099, at *2 (D. Minn. Dec. 20, 2016) ("Further, magistrate judges 'are afforded wide discretion in handling discovery matters and are free to use and control pretrial procedure in furtherance of the orderly administration of justice.'" (internal quotation marks omitted) (quoting *Favors v. Hoover*, No. 13-cv-428 (JRT/LIB), 2013 WL 6511851, at *3 n.3 (D. Minn. Dec. 12, 2013)).

In general, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). "Some threshold showing of relevance must be made[, however,] before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Further, "[t]he parties and the court have a collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes." *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742 (8th Cir. 2018) (quoting Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment). "[A] court can—and must—limit proposed discovery that it determines is not proportional to the needs of the case." *Id.* (quotation omitted); *see* Fed. R. Civ. P. 26(b)(2)(C)(iii). Considerations bearing on proportionality include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also Vallejo*, 903 F.3d at 742-43.

4

## 2.  No Other Responsive Information

Previously, the Court reminded the parties that

> a party cannot be compelled to produce what it does not have. *See, e.g.*, *Edeh v. Equifax Info. Servs., LLC*, 291 F.R.D. 330, 337 (D. Minn. 2013) ("Here, Equifax maintains that it does not have the documents requested in Requests for Production Nos. 3 and 4.  If Equifax does not have the documents in its possession, custody, or control, it cannot be compelled to produce them."); *see also Farmers Ins. Exch. v. West*, No. 11-cv-2297 (PAM/JJK), 2012 WL 12894845, at *5 (D. Minn. Sept. 21, 2012) ("Of course, the Court cannot order any party to produce something in discovery that does not, in fact, exist.").  "The Court must accept, at face value, a party's representation that it has fully produced all materials that are discoverable." *Bombardier Recreational Prods., Inc., v. Arctic Cat, Inc.*, No. 12-cv-2706 (MJD/LIB), 2014 WL 5685463, at *7 (D. Minn. Sept. 24, 2014) (quotation omitted)).

ECF No. 60 at 3.

Based on the grid submitted by the parties, WRB has stated that it has produced all responsive documents in its possession for MN Request for Production No. 11 and MR Request for Production No. 12.  *See also* Ex. 15 to Decl. of Paul Dietz, ECF No. 45-1 at 228; Ex. 14 to Decl. of Paul Dietz, ECF No. 45-1 at 211, 212.

The DAMM Defendants' motion is therefore denied as to MN Request for Production No. 11 and MR Request for Production No. 12.

## 3.  Compromise Reached

With respect to DAMM Request for Admission No. 9,[2] the grid reflects that WRB "agree[d] to supplement its response and admit that the cross peen hammer shown in US

---

[2] "Admit or deny that a cross-peen hammer looks different than a small finishing hammer."  Ex. 18 to Dietz Decl., ECF No. 45-1 at 274.

Trademark registration 5548112 looks different than the finishing hammer included with the Minneschlagen game" following clarification from the DAMM Defendants.

With respect to AR Request for Production No. 7,[3] the grid reflects that the DAMM Defendants offered to narrow this request to "communications from any licensee having [been] granted rights or permission to conduct activities without the presence of WRB under U.S. [T]rademark Registration Nos. 5548112 and 4804117 and the underlying trademarks of the same." At the hearing, WRB accepted the compromise proposal.

The DAMM Defendants' motion is therefore granted in part as to DAMM Request for Admission No. 9 and AR Request for Production No. 7. To the extent it has not done so already, WRB shall supplement its responses to these discovery requests consistent with the compromises reached.

### 4.  Valid Responses

#### a.    DAMM Interrogatory Nos. 9 & 10

In their memorandum and in the grid, the DAMM Defendants take issue with WRB's responses to DAMM Interrogatory Nos. 9[4] and 10[5], asserting that the responses

---

[3] "All communications from any licensee of WRB." Ex. 12 to Dietz Decl., ECF No. 45-1 at 173.

[4] "Describe all efforts you have taken, if any, to prevent individuals from making a game that includes a hammer, nail and a cross section portion of a tree." Ex. 20 to Dietz Decl., ECF No. 45-1 at 325.  Response:

> WRB has made no efforts to prevent individuals from making such a game for their own private use.  WRB has sent cease and desist letters to people making such a game for commercial use – including for sale to private individuals – in a manner that is confusingly similar to WRB's trade dress.  Copies of cease and desist letters have been produced in response to a request for production requiring all cease and desist letters.

Ex. 20 to Dietz Decl., ECF No. 45-1 at 325.

[5] "Describe all efforts you have taken, if any, to prevent individuals from referring to the combination of a hammer, nail and wood as a hammer-schlagen game." Response:

> WRB has utilized its website, paid advertising, and media publicity to educate the

are evasive and non-responsive or "conflict[] with other responses."  Defs.' Mem. in Supp.

at 21-22, ECF No. 47.

Under Rule 33, "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath."  Fed. R. Civ. P. 33(b)(3).  The Court has reviewed each of the responses and finds them to be sufficient.  Ultimately, "[the DAMM Defendants'] challenge to [WRB's] interrogatory answers boils down to a disagreement with the substance of [its] answers . . . ."  *Richard v. Dignean*, 332 F.R.D. 450, 460 (W.D. N.Y. 2019).  That the DAMM Defendants may "quibble[e] with the veracity" of WRB's responses is "not a basis for a motion to compel."  *Hickman v. Silva*, No. CA C-12-209, 2012 WL 4973041, at *2 (S.D. Tex. Oct. 17, 2012); *see also, e.g.*, *Bradford v. Owens*, No. 3:22CV-P488-S, 2014 WL 3513182, at *2 (W.D. Ky. July 14, 2014) ("Plaintiff's disagreement with Defendant's response is not a foundation for granting a motion to compel."); *Grant v. Target Corp.*, No. 2:10-CV-823, 2013 WL 571845, at *9 (S.D. Ohio Feb. 13, 2013) ("[A] motion to compel is not the correct way for Mr. Grant to argue about the factual accuracy of Target's responses."); *Stukes v. Chertoff*, No. 3:06CV316-R, 2008 WL 178468, at *1 (W.D. N.C. Jan. 18, 2008) ("[D]isagreement with the substance of the Defendant's responses does not constitute a factual basis for a meritorious Motion to Compel as a matter of law.").  "The purpose of a motion to compel

---

general public about the Hammer-Schlagen brand.  It has taken no actions to prevent people from using the name hammer-schlagen in private use, as such use is governed by the fair use doctrine.  WRB has sent cease and desist letters and sued individuals who have used the name Hammer-Schlagen in a confusingly similar manner in commerce.  Responsive documents have been produced.

Ex. 20 to Dietz Decl., ECF No. 45-1 at 326.

discovery is not to challenge the truthfulness of the response but rather to compel a party to *answer* the interrogatory.  [WRB] has done that, so there is nothing for the court to compel." *Stewart v. Cap. Newspapers, Inc.*, No. 09-CV-554-SLC, 2010 WL 1508289, at *3 (W.D. Wis. Apr. 14, 2010).  Therefore, the DAMM Defendants' motion is denied with respect to DAMM Interrogatory Nos. 9 and 10.

### b.   DAMM Request for Admission No. 24

The DAMM Defendants take similar issue with WRB's response to DAMM Request for Admission No. 24[6], asserting that WRB rewrote the request and gave an insufficient response.  In the grid, the DAMM Defendants also assert that WRB's response conflicts with other evidence and WRB's own publications.

Under Rule 36, "[i]f a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it."  Fed. R. Civ. P. 36(a)(4).  "The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny."  *Id.*  "Rule 36(a) does not authorize a Court to prospectively render determinations concerning the accuracy of a denial to a Request for Admission, or to order that the subject

---

[6] "Admit or deny that others not associated with WRB played a game using a hammer, nail, and stump prior to the incorporation of WRB."  Ex. 18 to Dietz Decl., ECF No. 45-1 at 285.  Response:

> WRB objects to this Request because the phrases "not associated with WRB" and "a game using a hammer, nail, and stump" are vague.  WRB lacks sufficient information to admit or deny this Request, and it cannot reasonably investigate whether anyone anywhere played an undefined game using a hammer, nail, and stump at some time prior to WRB's incorporation.

Ex. 18 to Dietz Decl., ECF No. 45-1 at 283.

matter of the request be admitted because the opposing party's unequivocal denial is asserted to be unsupported by the evidence." *Lakehead Pipe Line Co. v. Am. Home Assurance Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997); *see also Roe v. Bishop of Charleston*, 2021 WL 4272595, at *4 (D. S.C. Sept. 20, 2021) ("Plaintiff's mere dissatisfaction with the response does not render it improper."); *Joseph v. Fratar*, 197 F.R.D. 20, 23 (D. Mass. 2000) (noting Advisory Committee Notes to 1970 Amendments to Rule 37(c) state Rule 36 "does not provide for a pretrial hearing on whether the response is warranted by the evidence thus far accumulated" (quotation omitted)); *accord Lively v. Reed*, No. 1:20 CV 119 MOC WCM, 2021 WL 3729984, at *5 (W.D. N.C. Aug. 23, 2021).

The grid reflects that WRB sought clarification with respect to DAMM Request for Admission No. 24 regarding "[t]he phrase 'a game using a hammer, nail, and stump,'" reiterating that it was vague. In other requests for admission, the DAMM Defendants included clarifying phrases to describe the game. *See, e.g.*, Ex. 18 to Dietz Decl., ECF No. 45-1 at 285 ("a game at festivals that used a portion of a tree trunk, hammer, and nails and was called nail spiel or nagel balken"). Presumably, the "game" in question in DAMM Request for Admission No. 24 is one in which players take turns driving a nail into a stump with a hammer, not, for example, one in which players race to chisel bark off of a stump using a hammer and a nail. The DAMM Defendants had an opportunity to provide the requested clarification. They elected not to do so. Without any clarification, it was not unreasonable for WRB to respond that "it cannot reasonably investigate whether anyone anywhere played an undefined game using a hammer, nail, and stump at some time prior to WRB's incorporation." Ex. 18 to Dietz Decl., ECF No. 45-1 at 285. And, as stated

above, to the extent the DAMM Defendants believe WRB's response is inconsistent with other evidence, that is not a proper basis for a motion to compel.

Accordingly, the DAMM Defendants' motion is likewise denied as to DAMM Request for Admission No. 24.

### D. Other Requests

#### 1. DN Request For Production No. 4

DN Request for Production No. 4 seeks "[a]ll items relating to any rights, permissions, licensees, or assignments concerning any alleged trademark, service mark, or trade dress of WRB." Ex. 13 to Dietz Decl., ECF No. 45-1 at 193. WRB objected on grounds that the request was vague in the sense that it sought "'all items relating to'" and overly broad and unduly burdensome because it was "not limited in time or limited to the intellectual property at issue." Ex. 13 to Dietz Decl., ECF No. 45-1 at 193. WRB argues that, as written, this request "would include, for example, every communication with each of its customers because they are receiving permissions concerning WRB's intellectual property." Pl.'s Mem. in Opp'n at 12, ECF No. 56.

The DAMM Defendants have offered little in the way of clarification or compromise. The DAMM Defendants' last offer in compromise was "to limit the request to items associated with any rights, permissions, licenses, or assignments concerning any alleged trademark, service mark, or trade dress of WRB which grant rights, permissions, licenses or assignments to conduct acts," which in essence merely restates the request.

WRB's claims are premised on its federally registered marks. *See, e.g.*, Compl.

¶¶ 23, 26-28, 65-67, 74-76, 80, 83, 87, ECF No. 1; *see generally* Exs. 1 & 2 to Compl.,[7]

ECF No. 1-1.  One of these is U.S. Registration No. 5,548,112, what WRB calls its trade

dress, which "consists of a three-dimensional configuration constituting trade dress

comprising of a cylindrical cross-section of a tree with nails positioned around the outer

circumference of its upward facing flat circular surface, and a cross-peen hammer whose

head is shaped in the manner depicted in the drawing."  Ex. 1 to Compl., ECF No. 1-1 at

2; *see* Compl. ¶¶ 23, 26.  Another of these is U.S. Registration No. 4,804,117, what WRB

calls its service mark, for "Hammer-Schalgen."  Ex. 2 to Compl., ECF No. 1-1 at 5; *see*

Compl. ¶ 28.  Each of these refers to U.S. Registration No. 2,405,337.  Ex. 1 to Compl.,

ECF No. 1-1 at 2; Ex. 2 to Compl., ECF No. 1-1 at 5.  Although not expressly identified

by number in the Complaint itself, U.S. Registration No. 2,405,337 is WRB's federally

registered logo depicted in Paragraph 18 of the Complaint.

WRB alleges that it was formed in 1999 "solely for the purpose of marketing and

promoting Hammer-Schlagen," and that it has "continuously and exclusively promoted its

services under the Hammer-Schlagen brand since it was formed."  Compl. ¶ 18.  WRB

alleges U.S. Registration Nos. 4,804,117 (the Hammer-Schlagen mark) and 5,548,112 (the

trade dress) were first used in commerce as early as February 1999.  Compl. ¶¶ 27-28.

The DAMM Defendants' motion is granted in part as to DN Request for Production

No. 4 to the extent that WRB shall produce all items within the meaning of Federal Rule

of Civil Procedure 34 that evidence the rights, permissions, licensees, or assignments

---

[7] Although these exhibits are identified as Exhibits A and B in the Complaint, Compl. ¶¶ 27-28, the exhibits themselves are labeled Exhibits 1 and 2.

concerning U.S. Registration Nos. 2,405,337; 4,804,117; and 5,548,112 from January 1, 1999 to the present.  The DAMM Defendants' motion is otherwise denied as to DN Request for Production No. 4.

### 2.  DN Request for Production No. 5

DN Request for Production No. 5 seeks "all items relating to any formal or informal searches or investigations regarding use of any alleged trademark, service mark, or trade dress of WRB or any word, mark, or trade dress similar to any alleged trademark, service mark, or trade dress of WRB."  Ex. 13 to Dietz Decl., ECF No. 45-1 at 193.  WRB objected on grounds that this request did not seek relevant information and that it was "overly broad and unduly burdensome in that it is not limited in time or limited to the intellectual property at issue."  Ex. 13 to Dietz Decl., ECF No. 45-1 at 193.

The DAMM Defendants maintain that this request is "relat[ed] to knowledge of widespread generic use of the asserted mark and trade dress," and goes to issues of ownership, genericness, non-exclusive use, and functionality.  Defs.' Mem. in Supp. at 26. When asked by WRB as part of the Court-directed additional meet-and-confer to explain how its "formal or informal searches or investigations [are] related to ownership, genericness, non-exclusive use and functionality," the DAMM Defendants maintained that WRB "has not stated a resolution position and refuses to discuss."

The DAMM Defendants have not concretely identified and explained with any sort of specificity how the broad swath of information sought in DN Request for Production No. 5 is relevant to the claims or defenses in this case and proportional to the needs of the case.  The Court will not make arguments for the DAMM Defendants.  The DAMM

Defendants' motion is denied with respect to DN Request for Production No. 5.

### 3. DN Request for Production No. 7

DN Request for Production No. 7 seeks "[a]ll items that relate to any lawsuit, objection, demand, action, proceeding, settlement, covenant not to sue, resolution, or dispute concerning or involving any alleged trademark, service mark, or trade dress of WRB." Ex. 13 to Dietz Decl., ECF No. 45-1 at 194. WRB "agree[d] to produce copies of all cease and desist letters, lawsuits, and settlement agreements concerning its Hammer-Schlagen service mark and the HammerSchlagen [sic] Stump trade dress," and produced just under 700 documents. Ex. 13 to Dietz Decl., ECF No. 45-1 at 194. WRB otherwise objected on grounds of breadth.

The DAMM Defendants assert that DN Request for Production No. 7 is relevant to WRB's "efforts to enforce the asserted service mark and trade dress." Defs.' Mem. in Supp. at 17. As part of the Court-directed additional meet-and-confer, WRB asked the DAMM Defendants to explain why additional things, such as discovery responses and evidence from other litigation, were proportional to the needs of the case in light of its production. The DAMM Defendants again accused WRB of refusing to discuss its response, and assert that "it is far more efficient for [WRB] to produce the requested items rather than require [the DAMM Defendants] to duplicate prior matters."

Again, the Court will not make arguments for the DAMM Defendants. WRB has produced all cease-and-desist letters, complaints from lawsuits filed, and settlement agreements in its possession, custody, and control. It may be more "efficient" and convenient for the DAMM Defendants to have WRB produce every single thing from any

and all litigation involving the alleged marks.  It may also be that mining discovery from other litigation could result in additional information that the DAMM Defendants might find useful more generally.  But, it is not apparent to this Court how requiring WRB to produce every single thing from all other litigation involving the alleged marks is proportional to the needs of this case and the issue of WRB's efforts to enforce these marks, considering what WRB has already produced and the speculative nature the additional information sought by the DAMM Defendants has on any such efforts.  Accordingly, the DAMM Defendants' motion is denied with respect to DN Request for Production No. 7.

### 4.  MN Request for Production No. 12

MN Request for Production No. 12 seeks "[a]ll items that use or make reference to the words 'hammer-schlagen stump' or 'stump' as a source identifier of goods."  Ex. 15 to Dietz Decl., ECF No. 45-1 at 228.  WRB objected on grounds of relevance, vagueness, and overbreadth.

The DAMM Defendants assert that this request seeks information "relat[ed] to knowledge of widespread generic use of the asserted mark and trade dress."  Defs.' Mem. in Supp. at 26.  The DAMM Defendants further stated as part of the Court-directed additional meet-and-confer, that "WRB asserts that it has rights to the word hammerschlagen, hammerschlagen stump, and stump."  WRB responds that its "service mark is for the word 'Hammer-Schlagen' without the word stump" and "[i]t [has] already produced extensive responsive documents related to its use of the word 'hammer-schlagen' including all its sales and advertising records."  Pl.'s Mem. in Opp'n at 25; *see also* Ex. 19 to Frasier Decl., ECF No. 57-1 at 36.  WRB reiterated as part of the Court-directed

additional meet-and-confer, that "use of the word 'stump' is not at issue."

As stated above, U.S. Registration No. 5,548,112, what WRB calls its trade dress, "consists of a three-dimensional configuration constituting trade dress comprising of a cylindrical cross-section of a tree with nails positioned around the outer circumference of its upward facing flat circular surface, and a cross-peen hammer whose head is shaped in the manner depicted in the drawing." Ex. 1 to Compl., ECF No. 1-1 at 2; *see* Compl. ¶¶ 23, 26. In the Complaint, WRB states that its trade dress is "commonly referred to as the 'Hammerschlagen [sic] Stump.'" Compl. ¶ 23; *see also, e.g.*, Compl. ¶ 20 ("In addition to providing the service WRB sold the HammerSchlagen [sic] Stump continuously since 1999."), 30 ("Of all the designs they could have chosen, [the DAMM Defendants] chose one indistinguishable from the Hammerschalgen [sic] Stump . . . .").

The Court recognizes that the word "stump" is not incorporated into WRB's Hammer-Schlagen mark. WRB itself, however, indicates that its trade dress is "commonly referred to as the 'Hammerschlagen [sic] Stump.'" Compl. ¶ 23. Therefore, the Court will grant the DAMM Defendants' motion in part as to MN Request for Production No. 12 and, to the extent it has not already done so, WRB shall produce all items that use or make reference to the words "hammer-schlagen stump"[8] as a source identifier of goods. The DAMM Defendants' motion is otherwise denied as to MN Request for Production No. 12.

---

[8] As demonstrated by Paragraphs 20, 23, 30 of the Complaint alone, there appears to be variation in how the word "hammerschlagen" is capitalized. *Compare, e.g.*, Compl. ¶ 20 ("Hammer_S_chlagen") *with* Compl. ¶ 23 ("Hammer_s_chlagen"). The Court's ruling reflects the capitalization and hyphenation as propounded by the DAMM Defendants in MN Request for Production No. 12.

### 5.  MR Request for Production Nos. 4, 5, 6, & 7

MR Request for Production Nos. 4, 5, 6, and 7 seek information related to WRB's efforts to develop what could be described as certain components of its trade dress—a cylindrical cross-section of a tree or tree stump, a cross-peen hammer, and a nail—"with artistic or other unique characteristics" and "the unique, source-identifying, and non-functional features" of these components. Ex. 14 to Dietz Decl., ECF No. 45-1 at 204-05. WRB objected to these requests as seeking irrelevant information as "[t]rade dress is considered and evaluated as a whole, not by examining each discrete component." Ex. 14 to Dietz Decl., ECF No. 45-1 at 209-10. Subject to this objection, WRB produced documents "sufficient to demonstrate its development of its trade dress" and "the unique, source-identifying, and non-functional features of its trade dress." Dietz Decl., ECF No. 45-1 at 209-10.

At the hearing, WRB explained that it does not have documents responsive to particular components of its trade dress, just as to the trade dress as a whole, which were produced. The DAMM Defendants responded that they were seeking all "items," not just documents. WRB then represented that there were no "items" withheld.

"To be protectable, trade dress must be nonfunctional." *Pocket Plus, LLC v. Pike Brands, LLC*, Nos. 21-3414, 22-1304, 22-1396, ___ F. 4th ____, 2022 WL 16942365, at *2 (8th Cir. 2022). "The functionality doctrine serves as a buffer between patent law and trademark law by preventing a competitor from monopolizing a useful product feature in the guise of identifying itself as the source of the product." *Frosty Treats Inc. v. Sony Comp. Entm't Am. Inc.*, 426 F.3d 1001, 1007 (8th Cir. 2005) (quotation omitted); *accord*

16

*ASICS Corp. v. Target Corp.*, 282 F. Supp. 2d 1020, 1025 (D. Minn. 2003) ("The functionality doctrine prevents a producer from using trademark law to inhibit competition by controlling a useful product feature in perpetuity."). "The traditional rule is that a product feature is functional if 'it is essential to the use or purpose of the device or when it affects the costs or quality of the device.'" *Pocket Plus*, 2022 WL 16942365, at *2 (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001)); *see Frosty Treats*, 426 F.3d at 1007 ("[T]o be functional in the trade dress sense, the feature must be necessary to afford a competitor the means to compete effectively." (quotation omitted)). "Conversely, a feature is nonfunctional if it is an arbitrary embellishment primarily adopted for purpose of identification and individuality." *Pocket Plus*, 2022 WL 16942365, at *2 (quotation omitted).

"The trade dress of a product is the total image of a product, the overall impression created, not the individual features." *Insty*Bit, Inc. v. Poly-Tech Indus., Inc.*, 95 F.3d 663, 667 (8th Cir. 1996) (quotation omitted); *accord Gateway, Inc. v. Companion Prods., Inc.*, 384 F.3d 503, 507 (8th Cir. 2004). Stated differently, "the functionality analysis focuses on the collection of design elements, taken as a whole, rather than on whether individual elements of the trade dress could be categorized as functional." *Pocket Plus*, 2022 WL 16942365, at *3 (quotation omitted). It is, however, "possible for a trade dress to compromise some functional elements and some arbitrary elements so that the trade dress *as a whole* is nonfunctional and eligible for protection, while competitors remain free to copy the functional elements in their own designs." *Id.*

In essence, WRB argues that DAMM Defendants cannot inquire about individual

17

components of its trade dress because the ultimate legal analysis will focus on the "overall impression created" by that trade dress rather than the individual components.  WRB may well be right on the ultimate legal analysis.  But, that does not mean that the DAMM Defendants are prohibited from seeking information regarding development of certain aspects of the asserted trade dress, discovery which is relevant to their defense that WRB's trade dress is functional, *see* Affirmative Defenses ¶¶ 10-15 in Answer, ECF No. 9, and counterclaim that U.S. Registration No. 5,548,112 is invalid and unenforceable because it is functional, *see* Counterclaims ¶¶ 58-69 in Answer.

The DAMM Defendants' motion is granted as to MR Request for Production Nos. 4, 5, 6, and 7 to the extent additional responsive information exists.  WRB shall also supplement its responses to MR Request for Production Nos. 4, 5, 6, and 7 to state that no responsive "items" exist.

### 6.  MR Request for Production No. 11

MR Request for Production No. 11 seeks "[a]ll items that refer to or describe the use of wood, hammer, and nails as an activity or product."  Ex. 14 to Dietz Decl., ECF No. 45-1 at 212.  WRB objected to this request as "vague, overly broad, unduly burdensome, and not seeking evidence that is relevant to any claim or defense in this matter."  Ex. 14 to Dietz Decl., ECF No. 45-1 at 212.  As part of the Court-directed additional meet-and-confer, WRB pointed out that "[r]esponsive documents would include, for example, instructions on how to build a tree house, or an advertisement in a newspaper for the sale of a hammer" and asked the DAMM Defendants to provide further clarification.  The DAMM Defendants declined to do so.

As demonstrated by WRB's examples, this request is incredibly broad without any limitation as to the activities and products at issue in this case.  The DAMM Defendants' motion is denied as to MR Request for Production No. 11.

### 7.  DAMM Request for Production No. 11

DAMM Request for Production No. 11 seeks "[a]ll documents evidencing a consumer awareness of WRB."  Ex. 16 to Dietz Decl., ECF No. 45-1 at 245.  WRB objected to this request "as overly broad, vague, and not seeking evidence relevant to any claim or defense in seeking documents evidencing a consumer awareness of WRB generally."  Ex. 16 to Dietz Decl., ECF No. 45-1 at 245.  WRB further stated that

> [c]onsumer awareness of WRB – as opposed to WRB's marks – is not relevant to any claim or defense in this matter.  The ultimate inquiry regarding secondary meaning "is whether in the consumer's mind the mark denotes a single thing coming from a single source.  That single source, however, need not be known by name by consumers."

Ex. 16 to Dietz Decl., ECF No. 45-1 at 245 (quoting *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 789) (8th Cir. 1995) (internal quotation marks omitted)).

The Eighth Circuit Court of Appeals has stated that

> [i]t is well settled that secondary meaning, or acquired distinctiveness, requires that the user of a trade dress show that by long and exclusive use in the sale of the user's goods, the dress has become so associated in the public mind with such goods that the dress serves to identify the source of the goods and to distinguish them from those of others.

*Stuart Hall Co.*, 51 F.3d at 789.  As WRB correctly pointed out in its objection, "[t]he ultimate inquiry is whether in the consumer's mind the mark denotes a single thing coming from a single source.  *That single source, however, need not be known by name by*

19

consumers." *Id.* (quotation and citation omitted) (emphasis added); *see also, e.g.*, *Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1033 (N.D. Cal. 2017) ("Consumers need not be able to identify the source of the product by name."); *McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d 378, 390 n.5 (E.D. Pa. 2008) ("The exact name of a business or individual that produces the product or provides the service at issue need not be known by the public in order for there to be secondary meaning."); *Straumann Co. v. Lifecore Biomedical Inc.*, 278 F. Supp. 2d 130, 137 (D. Mass. 2003) ("To state the matter in more precise terms, what the law requires is that consumers view the design as indicating that the product comes from a *single* source, even if they cannot name the source in question."). Thus, the issue is not whether consumers know WRB's name, but whether they associate WRB's trade dress with a single source. *Stuart Hall Co.*, 51 F.3d at 789.

In addition to DAMM Request for Production No. 11, the DAMM Defendants also propounded DAMM Request for Production No. 10, which sought "[a]ll documents evidencing that consumers believe that there is a single source for a hammer-schlagen game." Ex. 14 to Dietz Decl., ECF No. 45-1 at 244. While WRB's response to this request was initially challenged, *see* Defs.' Mem. in Supp. at 27, WRB indicated through the Court-directed additional meet-and-confer, that it has "produced all responsive documents in its possession demonstrating that consumers believe the mark Hammer-Schlagen and the Stump trade dress indicate the product or service is coming from a single source." Based on the DAMM Defendants' most recent letter, WRB's response to DAMM Request for Production No. 10 is no longer at issue.

20

The DAMM Defendants have not sufficiently articulated how consumer awareness of *WRB* is relevant to the claims and defenses in this litigation. Moreover, in response to DAMM Request for Production No. 10, WRB produced all responsive documents in its possession indicating that consumers associate its Hammer-Schlagen mark and trade dress with a single source. Accordingly, the DAMM Defendants' motion is denied with respect to DAMM Request for Production No. 11.

### 8. DAMM Request for Production No. 12

DAMM Request for Production No. 12 requests "[a]ll items demonstrating that WRB has lost business because DAMM sells a portable game." Ex. 16 to Dietz Decl., ECF No. 45-1 at 245. WRB objected to this request "as a mischaracterization of [its] case." Ex. 16 to Dietz Decl., ECF No. 45-1 at 245. According to WRB, it "does not contend that [it] lost business because DAMM sells a portable game. It has lost business because DAMM markets a game using a name confusingly similar to WRB's service mark and because DAMM's game is designed in a manner that is virtually indistinguishable from WRB's trade dress." Ex. 16 to Dietz Decl., ECF No. 45-1 at 245. *Nevertheless*, WRB "agree[d] to produce documents demonstrating it has lost business because of DAMM's use of a confusingly similar name and a confusingly similar design. All responsive documents in WRB's possession have been produced at WRB001340 and 001348-1349." Ex. 16 to Dietz Decl., ECF No. 45-1 at 245.

The DAMM Defendants assert that this request is relevant to alleged confusion and damages. In support of their argument, the DAMM Defendants cite to arguments made in WRB's memorandum in support of its request for a preliminary injunction regarding

consumer confusion and lost business.

To the extent the DAMM Defendants claim in the grid completed by the parties as a part of the Court-directed additional meet-and-confer that WRB "provided no documents responsive to the request relying upon objections" and "has not identified the documents it asserts are responsive to this request," the Court will assume that the DAMM Defendants inadvertently confused this request with a different discovery request as WRB's response, which the DAMM Defendants filed as an exhibit to their motion, and the DAMM Defendants' own memorandum in support of their motion both reflect that documents were in fact provided and the documents are plainly identified in WRB's response. *See, e.g.*, Defs.' Mem. in Supp. at 29; Ex. 16 to Dietz Decl., ECF No. 45-1 at 245.

In the grid, the DAMM Defendants also claim that WRB "has not stated a resolution position and refuse[d] to discuss this request." Perhaps this too was inadvertent. Based on the record before the Court, however, WRB offered a resolution position *from the outset*, providing information responsive to its allegations of consumer confusion and lost business—the very issues the DAMM Defendants assert that this request was intended to seek. The DAMM Defendants' motion is denied with respect to DAMM Request for Production No. 12.

### 9.  Tree Requests

#### a.  DAMM Request for Admission Nos. 6 & 11

DAMM Request for Admission Nos. 6[9] and 11[10], ask WRB to admit or deny certain

things about the natural characteristics of trees.  The Court finds WRB's response to these

requests to be sufficient and the DAMM Defendants' motion is denied as to DAMM

Request for Admission Nos. 6 and 11.

#### b.  DAMM Request for Admission No. 17

DAMM Request for Admission No. 17 asks WRB to admit or deny that it "uses the

stump portion of a tree to provide entertainment services."  Ex. 18 to Dietz Decl., ECF No.

45-1 at 283.  WRB objected to this request "as vague in its use of the term 'stump portion.'"

Ex. 18 to Dietz Decl., ECF No. 45-1 at 284.  It did not admit or deny the request in whole

or in part, or state why it could not admit or deny it.  *See* Fed. R. Civ. P. 36(a)(4).  Rather,

WRB responded that it "uses wood rounds harvested from the bole and limbs of a tree to

provide entertainment services."  Ex. 18 to Dietz Decl., ECF No. 45-1 at 284.  As part of

---

[9] "Admit or deny that the base of a tree looks different than a tree limb."  Ex. 18 to Dietz Decl., ECF No. 45-1 at 281.  Response:

> [WRB] has insufficient information to admit or deny the request and objects to the Request as vague because the term "base" is undefined and does not describe a part of a tree.  Subject to that objection and to the extent "base" is intended to mean the trunk, WRB answers as follows: The appearance of the base of a tree and a tree limb depends on many factors, including the context from which it is being observed (e.g., free standing, after being felled, after being milled), the species of tree, and the age of the tree.  The base of a tree and a tree limb may look the same or different depending on those factors.

Ex. 18 to Dietz Decl., ECF No. 45-1 at 281.

[10] "Admit or deny that a tree is a naturally occurring object."  Ex. 18 to Dietz Decl., ECF No. 45-1 at 282.  Response: "[WRB] objects to Request No. 11 as vague in its use of the phrase 'naturally occurring object.' [WRB] admits that trees grow naturally.  Trees are also cultivated, pruned and shaped artificially."  Ex. 18 to Dietz Decl., ECF No. 45-1 at 282.

the Court-directed additional meet-and-confer, the DAMM Defendants offered that WRB "may assume the words 'stump portion' refers to the trunk or bole of a tree."

"[W]hen good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest." Fed. R. Civ. P. 36(a)(4). The bole of a tree is the "trunk of the tree, especially the highly marketable *lower portion* of a tree trunk." *Bole*, *Academic Press Dictionary of Science & Tech* 287 (Christopher Morris ed., 1992) (emphasis added) [hereinafter *Academic Press*]; *see also Bole*, *McGraw-Hill Dictionary of Scientific & Technical Terms* 263 (6th ed. 2003) [hereinafter *McGraw-Hill*] ("The main stem of a tree of substantial diameter; capable of yielding timber, veneer logs, and large poles."). The stump of a tree is "the standing *lower part* of a tree trunk after the upper part and branches have been cut off." *Stump*, *Academic Press* 2118 (emphasis added). In light of the DAMM Defendants' clarification as to the term "stump portion" in DAMM Request for Admission No. 17 and the fact that both bole and stump refer to the lower portion of a tree trunk, WRB should be able to admit DAMM Request for Admission No. 17 to the extent that it uses the stump portion of a tree to provide entertainment services.

Conversely, the limb of a tree is "a primary branch or bough of a tree." *Limb*, *Academic Press* 1240; *see also Limb*, *McGraw-Hill* 1205 ("A large primary tree branch."). To the extent WRB uses the limbs of a tree to provide entertainment services, it should be able to deny in part DAMM Request for Admission No. 17.

The DAMM Defendants' motion is granted as to DAMM Request for Admission No. 17 and WRB shall supplement its response to "specify so much of [DAMM Request

for Admission No. 17] as is true and qualify or deny the remainder."  Fed. R. Civ. P. 36(a)(4).

### c.  DAMM Request for Admission No. 22

DAMM Request for Admission No. 22 asks WRB to "[a]dmit or deny that the portion of the tree depicted in U.S. Registration No. 5,548,112 does not include bark on the sides of the depicted portion of the tree."  Ex. 18 to Dietz Decl., ECF No. 45-1 at 284. "WRB object[ed] to this Request because the term 'bark' is undefined and vague.  The term 'bark' includes the three outermost layers of a tree."  Ex. 18 to Dietz Decl., ECF No. 45-1 at 285.

As part of the Court-directed additional meet-and-confer, the DAMM Defendants offered that WRB could "assume the word 'bark' refers to the outermost layer of bark." *See, e.g.*, *Anatomy of a tree*, Forrest Serv., U.S. Dep't of Agric., https://www.fs.usda.gov/learn/trees/anatomy-of-tree (last accessed December 14, 2022) (distinguishing between outer and inner bark/phloem).  With this clarification, WRB "admitted that the image depicted on [U.S. Registration No. 5,548,112] does not include the outer bark layer."

The DAMM Defendants' motion is granted to the extent that WRB shall supplement its response to DAMM Request for Admission No. 22 to admit that the image depicted in U.S. Registration No. 5,548,112 does not include the outer bark layer.

### E.  Attorney Fees & Costs

WRB requests that it be awarded the attorney fees and costs it incurred in responding to the DAMM Defendants' motion to compel.  WRB asserts that the DAMM Defendants

did not properly meet and confer before filing their motion and failed to comply with the

Court's Local Rules when filing the motion.  When a motion to compel is granted in part

and denied in part as the Court has done here, Rule 37(a)(5)(C) of the Federal Rules of

Civil Procedure states that the Court "may . . . apportion the reasonable expenses for the

motion."

As the Court remarked at the hearing, the number of discovery requests initially

presented for resolution in this case was astounding.  It is apparent that the discovery

process has been a source of mutual frustration for the parties and the Court.  It continues

to be the view of this Court that genuine and good-faith efforts by counsel to engage in the

meet-and-confer process would have and should have resolved—and, in some cases, did

resolve—a significant number of the parties' disputes.  As a district judge in the Central

District of California aptly explained:

> The Court isn't quixotic. The system—and perhaps the
> client—demands attorneys be adversarial advocates.  But good
> advocacy often means picking up your ploughshare before
> your sword.   Compliance  with  [the  meet-and-confer
> requirement] isn't simply a procedural requirement to cross off
> before filing. It's not cooperation getting in the way of
> advocacy.  It's advocacy through cooperation.  Many of the
> issues in the pending Motion could have been hashed out with
> less expenditure of time, money, and ink if counsel had
> diligently worked together to satisfy both the letter and spirit
> of their meet and confer obligations.

*Le v. VBS Television*, No. SACV 13-689 AG (JPRx), 2013 WL 12125758, at *2 (C.D. Cal.

Dec. 9, 2013).  The fact that the parties themselves were able to narrow the issues in dispute

both after the Court-directed additional meet-and-confer and the parties' later renewed

efforts demonstrates that "good faith communications with opposing counsel can reduce

or eliminate unnecessary motion practice." *Icenhower v. Total Auto., Inc.*, No. 14-cv-1499

(ADM/TNL), 2014 WL 4055784, at *2 (D. Minn. Aug. 15, 2014).  Indeed, of the close to

120 disputed discovery requests collectively involved in WRB and the DAMM

Defendants' motions to compel as initially filed, the parties were ultimately able to resolve

close to 80% of them.

The Court concludes that any award of attorney fees and costs would have little if

any positive effect, and would serve only to embolden further the recipient party, entrench

the parties in their respective positions, and increase the costs of this litigation, making an

award of fees unjust under the circumstances.  Accordingly, each party shall bear its own

costs and attorney fees in connection with the DAMM Defendants' motion to compel.

### III. MOTION TO AMEND

The DAMM Defendants move for leave to amend their answer and counterclaims.

The DAMM Defendants describe their motion as seeking leave to "add clarity to their

answers, affirmative defenses and counterclaims" and "to withdraw an affirmative defense,

add detailed facts in support of [their] affirmative defenses and counterclaims, and add to

their claims for relief."  Defs.' Mem. in Supp. of Amend., ECF No. 65 at 1.

#### A.  Legal Standard

With the exception of amendments as a matter of course, the Federal Rules of Civil

Procedure permit a party to "amend its pleadings only with the opposing party's written

consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  The Rules further provide that

leave should be freely given "when justice so requires."  *Id.*  There is, however, "no

absolute right to amend" and a finding of undue delay, bad faith, dilatory motive, undue

prejudice to the non-moving party, or futility may be grounds to deny a motion to amend. *Doe v. Cassel*, 403 F.3d 986, 990-91 (8th Cir. 2005). "Fundamentally, 'the grant or denial of an opportunity to amend is within the discretion of the District Court.'" *Ash v. Anderson Merchandisers, LLC*, 799 F.3d 957, 963 (8th Cir. 2015) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

### B. Unopposed Amendments

Of the DAMM Defendants' proposed amendments, WRB confirmed at the hearing that eight items are unopposed. As identified in the DAMM Defendants' supporting memorandum, these are items (a), (b), (c), (d), (e), (g), (h), and (k). *Compare* Defs.' Mem. in Supp. of Amend. at 3-5 *with* Defs.' Reply at 3-4, ECF No. 76. There being no opposition thereto, the DAMM Defendants' motion is granted with respect to the proposed amendments identified as items (a), (b), (c), (d), (e), (g), and (h) in their supporting memorandum. The DAMM Defendants' motion is further granted in part as to item (k) in their supporting memorandum as to proposed Paragraph L in Prayers for Relief,[11] but otherwise denied as to proposed Paragraphs J and K in Prayers for Relief for the reasons stated in Sections III.C.1 and .2 *infra*.

### C. Opposed Amendments

The DAMM Defendants seek leave to add clarification and factual allegations to Counterclaim II, which asserts violations of the Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"), Minn. Stat. §§ 325D.43-.48, and add factual allegations and

---

[11] In the interest of clarity, the Court will endeavor to include the relevant section of the DAMM Defendants' proposed amended pleading in its citations.

a "legal basis" to Counterclaim III, which alleges fraudulent registration in violation of 15 U.S.C. § 1120.  WRB opposes the proposed MUDTPA and § 1120 amendments on grounds of futility.  This is the DAMM Defendants' second motion seeking leave to amend regarding these claims.  *See generally* ECF Nos. 36-42, 55, 62.

"Futility is a valid basis for denying leave to amend."  *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 589 (8th Cir. 2018) (quotation omitted); *see also, e.g.*, *Anderson v. Bank of the West*, 23 F.4th 1056, 1060 (8th Cir. 2022).  "An amendment is futile if the [proposed] claim could not withstand a motion to dismiss under Rule 12(b)(6)."  *Hillesheim v. Myron's Cards & Gifts, Inc.*, 897 F.3d 953, 955 (8th Cir. 2018) (quotation omitted); *see also Munro*, 899 F.3d at 589 ("When the court denies leave on the basis of futility, it means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure." (quotation omitted)).

"To withstand a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations to 'state a claim to relief that is plausible on its face.'"  *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  "While a plaintiff need not set forth detailed factual allegations, or specific facts that describe the evidence to be presented, the complaint must include sufficient factual allegations to provide the grounds on which the claim rests."  *Warmington v. Bd. of Regents of the Univ. of Minn.*, 998 F.3d 789, 795-96 (8th Cir. 2021) (quotation omitted); *see also Twombly*, 550 U.S. at 555.  "A claim is facially plausible where the plaintiff 'pleads factual content that allows the court to draw the reasonable inference that

29

the defendant is liable for the misconduct alleged.'" *Warmington*, 998 F.3d at 795 (quoting

*Twombly*, 550 U.S. at 570).  "This standard 'asks for more than a sheer possibility that a

defendant has acted unlawfully." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"When determining whether a complaint states a facially plausible claim, a district court

accepts the factual allegations in the complaint as true and draws all reasonable inferences

in the plaintiff's favor." *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 668 (D. Minn.

2021).

### 1.   Counterclaim II

Counterclaim II alleges WRB engaged in deceptive trade practices in violation of

the MUDTPA.  "The [MUDTPA] prohibits the misrepresentation of goods or services

being sold." *Wright v. Capella Univ.*, 378 F. Supp. 3d 760, 772 (D. Minn. 2019).

### a.   Disparagement

Under Minnesota law, it is a deceptive trade practice to "disparage[] the goods,

services, or business of another by false or misleading representation of fact."  Minn. Stat.

§ 325D.44, subd. 1(8).  As explained by the Minnesota Supreme Court, this provision of

the MUDTPA has its "genesis in the common law tort of disparagement." *United Wild*

*Rice, Inc. v. Nelson*, 313 N.W.2d 628, 634 (Minn. 1982).

In Counterclaim II, the DAMM Defendants allege that WRB has disparaged their

business.  The DAMM Defendants allege that "WRB sent demand letters to . . . [various]

DAMM Partners" "contain[ing] false allegations and misstatements of fact and law."

Counterclaims ¶ 43 in Proposed Am. Answer & Counterclaims, Ex. 1 to Decl. of Paul

Dietz, ECF No. 66-1; *see also* Counterclaim II ¶¶ 53-55 in Proposed Am. Answer &

Counterclaims.  The DAMM Defendants also allege that "[u]pon information and belief, in conjunction with its demand letters, representatives of WRB also communicated with some or all of the DAMM Partners" and "[t]hese communications included disparaging remarks about [the DAMM Defendants] beyond the scope of DAMM's allegedly infringing product."  Counterclaims ¶ 45 in Proposed Am. Answer & Counterclaims; s*ee also* Counterclaim II ¶ 55 in Proposed Am. Answer & Counterclaims.

While the DAMM Defendants allege that WRB sent "demand letters to, and/or communications about DAMM with DAMM Partners [that] disparaged the goods or business of DAMM," Counterclaim II ¶ 55 in Proposed Am. Answer & Counterclaims, the proposed factual allegations describe statements purportedly made by WRB about the scope of *its own* intellectual property rights, not the DAMM Defendants or their business. *See, e.g.*, Counterclaim II ¶¶ 57-61 in Proposed Am. Answer & Counterclaims.  As the Eighth Circuit stated in *Warmington*, this Court "need not conjure up unpled allegations to save a complaint." [12]  998 F.3d at 796 (quotation omitted).  Absent factual allegations from which it can be reasonably inferred that the DAMM Defendants or their business was disparaged, the DAMM Defendants' proposed amendments related to Minn. Stat. § 325D.44, subd. 1(8) are futile.

### b.    Catch-All Claim

Subdivision 1(13) of Minn. Stat. § 325D.44 is a catch-all provision of sorts.  *See Maneval v. Jon R. Hawks, Ltd.*, No. 09-cv-1935 (JRT/FLN), 1999 WL 33911242, at *6 (D.

---

[12] The DAMM Defendants did not directly address their claim under Minn. Stat. § 325D.44(8) in either their principal memorandum or their reply, but rather focused on Minn. Stat. § 325D.44(13).

Minn. Oct. 13, 1999).  Under it, deceptive trade practices include "any other conduct which similarly creates a likelihood of confusion or of misunderstanding."   Minn. Stat. § 325D.44, subd. 1(13).  Notwithstanding the breadth of the statutory language, courts have held that subdivision 1(13) "must be interpreted in . . . context" and "only regulates conduct that is 'similar' to the [other] listed conduct" in subdivision 1.  *Maneval*, 1999 WL 33911242, at *6; *see also, e.g.*, *Cohen v. Mortg. Elec. Registration Sys., Inc.*, No. 08-cv-1394 (ADM/JSM), 2009 WL 4578308, at *3 (D. Minn. Dec. 1, 2009); *In re Simitar Ent't, Inc.*, 275 B.R. 331, 348-49 (Bankr. D. Minn. 2002).  This conduct includes "confusion, deception, or misunderstanding regarding the source, sponsorship, approval, certification, affiliation, connection, association, designation of geographic origin, ingredients, uses, benefits, number of sponsors, newness, status, quality, standard, grade, style, or model of goods or services."  *Cohen*, 2009 WL 4578308, at* 3 (citing Minn. Stat. § 345D.44, subd. 1(1)-(7)).  It also includes "disparaging the goods or services of another, advertising goods or services with no intent to sell them as advertised or no intent to supply reasonably expectable public demand, making misleading statements concerning price reductions, and implying or suggesting while attempting to collect a delinquent account that a consumer's health care services will be withheld."  *Id.* (citing Minn. Stat. § 325D.44, subd. 1(8)-(12)).  As such, subdivision 1(13) has been interpreted to "address the same type of confusion, misunderstanding, or deception addressed in the other 12 enumerated examples [of subdivision 1] and does not contemplate entirely different types of confusion, misunderstanding, or deception."  *Id.*; *accord Peterson-Price v. U.S. Bank Nat'l Ass'n*, No. 09-cv-495 (ADM/JSM), 2010 WL 1782188, at *14 (D. Minn. May 4, 2010).  Accordingly,

"[g]iven the nature of the types of conduct described in the statute's enumerated examples, it is clear that 'confusion' within the statute's ambit is the mistaking of the identity of a product, or one of a product's essential aspects, for that of another product." *In re Simitar Ent't*, 275 B.R. at 349; *see McInroy v. BAC Home Loan Serv., LP*, No. 10-cv-4342 (DSD/SER), 2011 WL 1770947, at *4 (D. Minn. May 9, 2011) ("Confusion under the MUDTPA means a mistake in the identity or essential aspects of a service for that of another service."); *see also Lyon Fin. Servs., Inc. v. MBS Mgmt. Servs., Inc.*, No. 06-cv-4562 (PJS/JJG), 2007 WL 2893612, at *8-9 (D. Minn. Sept. 27, 2007).

As stated above, the factual allegations the DAMM Defendants seek to add concern statements allegedly made by WRB with respect to the scope of its intellectual property rights.  In essence, the DAMM Defendants' proposed amendment is "that WRB created confusion about its rights to its intellectual property."  Pl.'s Mem. in Opp'n to Amend. at 13.  This is not the sort of confusion falling within the ambit of subdivision 1.  *Compare, e.g.*, *Peterson-Price*, 2010 WL 1782188, at *14 ("alleged misrepresentations and misleading statements made in connection with the recording of the mortgage assignment" not actionable under Minn. Stat. § 325D.44, subd. 1(13)); *Cohen*, 2009 WL 4578308, at *4 (confusion regarding servicer's calculation of amount due on mortgage and manner in which payment was posted and applied to account not actionable under Minn. Stat. § 325D.44, subd. 1(13)), *with Wright*, 378 F. Supp. 3d at 772 (allegations university made "false representation concerning the time and cost of its doctoral programs" stated claim under MUDTPA); *Lyon Fin. Servs.*, 2007 WL 2893612, at *8-9 (delivery of photocopiers with different serial numbers than those promised in leases and failure to disclose leasing

cost "was about ten times [photocopiers'] retail price" stated claim under MUDTPA). Therefore, the DAMM Defendants' proposed amendments related to Minn. Stat. § 325D.44, subd. 1(13) are also futile.

Based on the foregoing, the DAMM Defendants' motion is denied with respect to the phrase "to disparage Defendant DAMM LLC's business" in proposed Paragraph 114 in the Statement of WRB's Fraud, proposed Paragraphs 52 and 57-65 in Counterclaim II, and proposed Paragraph J in Prayers for Relief.[13]

### 2. Counterclaim III

In Counterclaim III, the DAMM Defendants allege that WRB's trade dress and Hammer-Schlagen mark are invalid and unenforceable. The DAMM Defendants seek leave to add a claim for damages under 15 U.S.C. § 1120, alleging that WRB, through its CEO Jim Martin, submitted a knowingly false, i.e., fraudulent, declaration as to ownership and exclusivity in connection with the application to register the disputed trade dress (U.S. Registration No. 5,548,112). Counterclaim III ¶ 97 in Proposed Am. Answer & Counterclaims ("In accordance with 15 U.S.C. § 1120 DAMM LLC is entitled to recover all damages it has sustained as a consequence of the fraudulent registration of U.S. Registration No. 5548112."); Defs.' Mem. in Supp. of Amend. at 15 ("Defendants only assert a claim for damages under 15 U.S.C. § 1120 which was sustained as a consequence of Trademark Registration No. 5,548,112 (the '112 registration)."); *see* Defs.' Mem. in

---

[13] Because the Court concludes that Minnesota law does not permit the DAMM Defendants to assert the sort of claims they seek to bring under Minn. Stat. § 325D.44, subd. 1(8) and (13), the Court declines to address WRB's arguments that its alleged conduct is protected by the *Noerr-Pennington* doctrine or that the DAMM Defendants have "failed to adequately allege irreparable harm and a threat of future harm." Pl.'s Mem. in Opp'n to Amend. at 13.

Supp. of Amend. at 2 (discussing ownership and exclusive use), 18 (same); Defs.' Reply at 16-18 (same).

WRB asserts that the DAMM Defendants' claim under 15 U.S.C. § 1120 is futile because (1) the DAMM Defendants lack standing to assert such a claim since DAMM was not in existence when the application to register its trade dress was filed and the trade dress was ultimately registered; (2) the proposed allegations regarding knowledge of other users and ownership were not material; and (3) the DAMM Defendants have not plausibly alleged causation and harm.

When applying for a trademark, an applicant must submit a verified statement specifying, among other things, that "the person making the verification believes that he or she, or the juristic person in whose behalf he or she makes the verification, to be the owner of the mark sought to be registered" and that

> to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1051(a)(3)(A), (D).

An applicant for a trademark owes a duty of candor to the United States Patent and Trademark Office ("USPTO"). *Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 877 (8th Cir. 1994) (per curiam). Under 15 U.S.C. § 1120, "[a]ny person who shall procure registration in the [USPTO] of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person

injured thereby for any damages sustained in consequence thereof." *See also, e.g.,* *Aromatique*, 28 F.3d at 875 ("Section 38 of the Lanham Act makes a person who procured the registration of a trademark by fraudulent means liable for damages sustained as a consequence of that fraud." (citing 15 U.S.C. § 1120)).

"Fraud in procuring a trademark registration . . . occurs when an applicant knowingly makes false, material representations of fact in connection with his application." *Fair Isaac Corp. v. Experian Info. Sols., Inc.*, 650 F.3d 1139, 1148 (8th Cir. 2011) (quoting *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009)). "[T]here is a material distinction between a false representation and a fraudulent one, the latter involving an intent to deceive, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like." *In re Bose Corp.*, 580 F.3d at 1244 (quotation omitted). "There is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive." *Id.* at 1246; *see Aromatique*, 28 F.3d at 877-78.

> To allege a claim for fraudulent procurement of a trademark registration, a plaintiff must allege: (1) a false or fraudulent representation of a material fact by the applicant in connection with obtaining the trademark; (2) knowledge that the representation was false; (3) the defendant's intent to induce the USPTO to rely on the misrepresentation; (4) reasonable reliance by the USPTO on the misrepresentation; and (5) damages proximately caused by the defendant's misrepresentation.

*GFR, Ltd. v. Farner*, No. 1:18-CV-238, 2019 WL 1198538, at *3 (W.D. Mich. Mar. 14, 2019); *see also, e.g.*, *Jaguar Land Rover Ltd. v. Bombardier Recreational Prods., Inc.*, No. 16-cv-13386, 2017 WL 2472851, at *2 (E.D. Mich. June 8, 2017); *FD9 Grp., Inc. v. Bangle*

*Jangle, LLC*, No. CV 15-00512 BRO (ASx), 2015 WL 12776584, at *5 (C.D. Cal. May 13, 2015).

### a. Ownership

The DAMM Defendants allege that WRB, through Martin, asserted ownership in the disputed trade dress despite the lack of any written assignments by WRB's predecessors transferring any rights there were or may have been in "the nail driving game or activity," "trademarks used to identify the game or activity," the "trade dress of the game or activity," or the "goodwill associated with the game or activity." *See, e.g.*, Statement of WRB's Fraud ¶¶ 4-5, 10, 21, 88-96 in Proposed Am. Answer & Counterclaims.

The DAMM Defendants allege that, "from the 1960's to the late 1980's[,] a person by the name of Carl Schoene played an activity with a cross peen hammer, nails, and a tree stump and called his nail driving activity Nagelspiel"; Schoene "used the game and played the nail driving activity at a restaurant owned by Schone's [sic], Inc."; Schoene used the game "as a marketing tool for the restaurant"; Schoene "made no effort to stop consumers from using the word hammer-schlage or hammer-schlagen as a common, everyday name for a game or activity that is played by the public using [a] hammer, nails, and wood (stump, log, board, etc.)"; and, between 1974 and 1999, Schoene made no effort to stop anyone "from using any portion of a tree as a component to play a nail driving game" or "from offering to consumers a game or activity that used any portion of a tree as a component of the game." Statement of WRB's Fraud ¶¶ 1-3, 12, 13-14 in Proposed Am. Answer & Counterclaims.

The DAMM Defendants additionally allege that, "from the late 1980's to 1999,"

Michael "Mike" Wlaschin played the nail-driving game at Schoene's restaurant; Wlaschin asked "German immigrants for a German word that would describe the activity" and was told "the word hammerschlagen was a German verb having the meaning 'to strike with a hammer'"; Wlaschin "promoted and marketed the activity in Minnesota and Wisconsin as Hammer-Schlagen and charged a fee to play"; WRB was formed in 1999 and Wlaschin was an employee until 2014; "Wlaschin made no effort to stop consumers from using the word hammer-schalge or hammer-schlagen as a descriptive and common, everyday name for a game or activity that is played by the public using [a] hammer, nails, and wood (stump, log, board, etc.)"; and between 1988 and 1999, Wlaschin made no effort to stop anyone "from using any portion of a tree as a component to play a nail driving game" or "from offering to consumers a game or activity that used any portion of a tree as a component of the game." Statement of WRB's Fraud ¶¶ 6-9, 11, 15-17 in Proposed Am. Answer & Counterclaims. The DAMM Defendants allege that between January 1999 and November 2014, WRB "sent no letters to any other individual or entity asserting that it had exclusionary rights in the word hammer-schlagen or that it had exclusionary rights to the use of any portion of a tree as a component of a game." Statement of WRB's Fraud ¶ 18 in Proposed Am. Answer & Counterclaims.

The DAMM Defendants go on to allege that, in November 2014, Wlaschin sold all the shares of WRB to Martin through a stock purchase agreement and this stock purchase agreement did

> not transfer any right, title, or legal interest that . . . Wlaschin had or may have had in or to the nail driving game or activity, in or to trademarks used to identify the game or activity, in or

> to service marks used to identify the activity, in or to trade
> dress of the game or activity, or good will associated with the
> game or activity.

Statement of WRB's Fraud ¶¶ 19, 21 in Proposed Am. Answer & Counterclaims.

The DAMM Defendants then allege that, at the time WRB applied to register its trade dress in 2015, Martin was aware that there was no "written instrument" transferring to WRB from Schoen, "Schone's [sic], Inc.," or Wlaschin "[a]ny right, title, or legal interest . . . in or to trade dress of a game, activity or service, or good will associated with a game, activity or service" and that WRB "did not disclose its theories of ownership of predecessor rights to the [USPTO] when seeking registration of trade dress." Statement of WRB's Fraud ¶¶ 93, 95 in Proposed Am. Answer & Counterclaims; *see* Statement of WRB's Fraud ¶¶ 90-95, Counterclaim Count III ¶¶ 86-90 in Proposed Am. Answer & Counterclaims.

WRB argues that any § 1120 claim based on a fraudulent declaration of ownership is futile because "the Lanham Act only imposes a writing requirement on assignments of a 'registered mark or mark for which an application to register has been filed,' and the transfers at issue here took place in 1999, more than 15 years before registration." Pl.'s Mem. in Opp'n to Amend. at 8 (quoting 15 U.S.C. § 1060(a)(1)) (footnote omitted). The DAMM Defendants respond that "oral statements are not admissible to prove the truth of the matter asserted (ownership)." Defs.' Mem. in Supp. of Amend. at 17. The DAMM Defendants add that they have alleged that the disputed marks "originated with individuals who have not assigned any rights to [WRB]" and "that any . . . rights or goodwill of the individuals were abandoned." Defs.' Mem. in Supp. of Amend. at 17.

Federal law provides that "[a] registered mark or a mark for which an application to register has been filed shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark."   15 U.S.C. § 1060(a)(1).   "Assignments shall be by instruments in writing duly executed."   *Id.* § 1060(a)(2).   As alleged, WRB applied to register its trade dress in 2015.   *See, e.g.*, Statement of WRB's Fraud ¶ 88 in Proposed Am. Answer & Counterclaims.   Taking the DAMM Defendants' factual allegations as true, any transfers occurred *prior to* when WRB applied for registration.   "[C]ommon law rights may be assigned orally."   *Baskim Holdings, Inc. v. Two M, Inc.*, No. 2:16-cv-01898-APG-GWF, 2018 WL 1367354, at *2 (D. Nev. Mar. 16, 2018) (citing cases).   The DAMM Defendants argue that it is disputed whether ownership was "acquired . . . through an oral conveyance." Defs.' Reply at 17.   That may be true. But, under the proposed amendments and the facts alleged, it cannot be plausibly inferred that a written assignment was required.   Therefore, the DAMM Defendants have failed to state a claim under § 1120 based on the alleged lack of a written instrument assigning ownership of the disputed trade dress.[14]

---

[14] The Court notes that the DAMM Defendants also seek cancellation of the disputed trade dress under 15 U.S.C. § 1064(3) on the basis of fraud in the procurement, among other things.  Counterclaim III ¶ 98 in Proposed Am. Answer & Counterclaims.  Additionally, the DAMM Defendants claim contestability and seek cancellation of WRB's Hammer-Schlagen mark on the same theories (ownership and exclusivity) of fraud in the procurement along with acquired distinctiveness.  *See, e.g.*, Counterclaim III ¶¶ 80-83 in Proposed Am. Answer & Counterclaims.

It may very well be that the Court's analysis as to the DAMM Defendants' proposed § 1120 claim applies with equal force to the DAMM Defendants' requests for relief under § 1064(3) and 15 U.S.C. § 1065.  WRB has not made such an argument.  Nor has it challenged any amendments as they might relate to the DAMM Defendants' requests for relief under §§ 1064(3) and 1065.  The Court will not make arguments for WRB.  Nothing in this Order should be construed as expressing an opinion on the DAMM Defendants' requests for relief under §§ 1064(3) and 1065.

### b. Exclusivity

The DAMM Defendants allege that, by 2015, "it was commonplace for a log, stump, or other form of a cross-section or portion of a tree to be used as a game board for a game played using a cross peen hammer and nails." Statement of WRB's Fraud ¶ 25 in Proposed Am. Answer & Counterclaims.

The DAMM Defendants allege that, "beginning in 2005," "Festivals, Inc. began using the word hammerschlagen as a reference to services it provided at a yearly Oktoberfest" event in Washington, which involved "providing persons an opportunity to participate in a game in which participants drive nails into logs"; this event was organized and promoted as "a 'Hammerschlagen Tournament of Champions'"; and this event took place at the Oktoberfest events each year between 2005 and 2015. Statement of WRB's Fraud ¶¶ 26-29 in Proposed Am. Answer & Counterclaims.

The DAMM Defendants additionally allege that, based on prior deposition testimony, Martin became aware of the Festivals, Inc./Oktoberfest Northwest LLC activity sometime in 2008; WRB did not have a licensee in Washington until 2015 or 2016; and Martin believed "there was a likelihood of confusion between WRB's use of the hammer-schlagen mark and trade dress and Festivals, Inc. and Oktoberfest Northwest LLC's use of the hammerschlagen mark and trade dress to identify the same or similar services." Statement of WRB's Fraud ¶¶ 30-34 in Proposed Am. Answer & Counterclaims; *see, e.g.*, Ex. H to Proposed Am. Answer & Counterclaims, ECF No. 66-1 at 147-48.

The DAMM Defendants further allege that "there are multiple restaurants in the state of Minnesota operating under the business name 'Zorbaz'" and "one or more of the

41

Zorbaz restaurants have provided entertainment services in the nature of providing persons an opportunity to participate in a game in which participants drive nails into logs for more than 30 years."   Statement of WRB's Fraud ¶¶ 35-36 in Proposed Am. Answer & Counterclaims.

According to the DAMM Defendants, at the time WRB applied for (and Martin submitted the declaration in support of) registration of its Hammer-Schlagen mark in February 2015, Martin was aware of (1) "a Zorbas restaurant . . . providing persons an opportunity to participate in a game in which participants drive nails into logs in the state of Minnesota"; (2) "other businesses in Minnesota and other states of the United States . . . providing in commerce entertainment services in the nature of providing persons an opportunity to participate in a name in which participants drive nails into logs"; and (3) "other businesses in Minnesota and other states of the United States using the word hammer-schlagen in conjunction with providing commerce in the nature of providing persons an opportunity to participate in a game in which participants drive nails into logs." Statement of WRB's Fraud ¶¶ 37-39 in Proposed Am. Answer & Counterclaims.  And, at the time WRB applied to register its trade dress in July 2015 and Martin submitted a declaration in support of such registration, WRB "believed that any current use in commerce by another of the combination of a hammer, log and nail as an activity or use of the word hammer schlagen was likely to be confused with its use in commerce of the word hammer-schlagen and its trade dress."  Statement of WRB's Fraud ¶ 40 in Proposed Am. Answer & Counterclaims.

"A party may allege fraud in the procurement of a trademark by showing, *inter alia*,

that a trademark applicant knowingly and falsely declared under oath in conjunction with the trademark application that no other person, firm, corporation, or association has the right to use such mark in commerce." *AirWair Int'l Ltd. v. Schultz*, 84 F. Supp. 3d 943, 952 (N.D. Cal. 2015); *see* 15 U.S.C. § 1051(a)(3)(D). "As discussed in *Trademarks and Unfair Competition*, the allegation of 'failure to disclose use by others' spawns the greatest number of fraud in the procurement cases but remains 'a serious charge which is not easily proven." *San Juan Prods., Inc. v. San Juan Pools of Kansas, Inc.*, 848 F.2d 468, 472 (10th Cir. 1988) (quoting 2 J. McCarthy, § 31:21, at 614)).

"An applicant is not obligated to investigate and report all other possible users of an identical or confusingly similar mark." *AirWair Int'l Ltd.*, 84 F. Supp. 3d at 952 (quotation omitted); *see also Rosso & Mastracco, Inc. v. Giant Food Inc.*, 720 F.2d 1263,1266 (Fed. Cir. 1983); *LiveRamp, Inc. v. Kochava, Inc.*, No. 19-CV-02158-CRB, 2020 WL 2065696, at *3 (N.D. Cal. Apr. 29, 2020). "[A]n applicant must only disclose 'conflicting rights' of another user 'which are *clearly established*, for example, by a court decree, by the terms of a settlement agreement, or by a registration.'" *AirWair Int'l Ltd.*, 84 F. Supp. 3d at 952 (quoting *Rosso*, 720 F.3d at 1266); *accord LiveRamp*, 2020 WL 2065696, at *3. "It is therefore insufficient to allege only that the trademark applicant was aware of and failed to disclose another party's use of the contested mark." *LiveRamp*, 2020 WL 2065696, at *3.

Moreover, "[t]he declarant-focused text of the application oath requires the signatory's good-faith subjective belief in the truth of its contents." *Sovereign Military Hospitaller Order of St. John of Jerusalem of Rhodes & of Malta v. Fla. Priory of Knights Hospitallers of Sovereign Order of St. John of Jerusalem*, 702 F.3d 1279, 1290 (11th Cir.

43

2012) (citing cases) [hereinafter *Sovereign Military Hospitaller*]. "The 'oath' an applicant signs requires only that the declarant state 'to the best of *his knowledge and belief* no other person, firm, corporation, or association has the right to use said mark in commerce.'" *San Juan Prods.*, 848 F.2d at 472. "If the declarant subjectively believes the applicant has a superior right to use the mark, there is no fraud, even if the declarant was mistaken." *Sovereign Military Hospitaller*, 702 F.3d at 1292 (citing *In re Bose*, 580 F.3d at 1246 ("There is no fraud if a false misrepresentation is occasioned by an honest misunderstanding or inadvertence without a willful intent to deceive.")); *see AirWair Int'l Ltd.*, 84 F. Supp. 3d at 952-53 ("[T]he statement of an applicant that no other person to the best of his knowledge has the right to use the mark does not require the applicant to disclose those persons whom he may have heard are using the mark *if he feels that the rights of such others are not superior to his*." (quotations omitted)). As explained by a district judge sitting in the Northern District of California:

> This rule makes sense. There is a meaningful difference between representing that no other party has "*the right* to use the mark in commerce," and representing that no other party *is* using the mark in commerce. Another party could be using the mark without the right to do so. As such, the applicant does not necessarily know that another party has *a right* to use the mark in commerce merely because that other party is, in fact, using the mark. And it would not be sensible to require trademark applicants to "investigate and report all other possible users" of their mark in order to avoid a possible claim for cancellation based on fraud.

*LiveRamp*, 2020 WL 2065696, at *3 (citing *AirWair Int'l Ltd.*, 84 F. Supp. 3d at 952).

Assuming the truth of the DAMM Defendants' factual allegations, WRB and Martin were aware of Festivals, Inc./Oktoberfest Northwest LLC, Zorbaz, and "other businesses'"

use of the disputed trade dress at the time of application and submission of the declaration. But, awareness is not enough. *Id.* The DAMM Defendants have not alleged facts from which it can be plausibly inferred that WRB was aware that any of these entities held rights *superior* to WRB or that any such rights "were *clearly established* such that [WRB] would have known that . . . [one of them] had a right to use the [the disputed trade dress]." *LiveRamp*, 2020 WL 2065696, at *4 (emphasis added); *see AirWair Int'l Ltd.*, 84 F. Supp. 3d at 953. Accordingly, under the proposed amendments, the DAMM Defendants have likewise failed to state a claim under § 1120 based on a lack of exclusivity with respect to the disputed trade dress.[15]

Based on the foregoing, the DAMM Defendants' motion is denied with respect to the § 1120 claim and proposed Paragraph 97 in Counterclaim Count III and Paragraph K in Prayer for Relief.[16]

### D. "Statement of WRB's Fraud" & Other Amendments

The DAMM Defendants also seek leave to add a "Statement of WRB's Fraud," consisting of more than 100 paragraphs of factual allegations and six exhibits describing the circumstances of WRB's alleged fraudulent conduct, which the DAMM Defendants assert form the basis of certain affirmative defenses and support their three counterclaims. *See generally* Statement of WRB's Fraud ¶¶ 1-114 in Proposed Am. Answer & Counterclaims. They also seek leave to add other various amendments, such as, for

---

[15] *See supra* n.14.
[16] Because the Court concludes that the DAMM Defendants have failed to state a claim under § 1120, the Court declines to address WRB's arguments as to standing, materiality, and harm as well as the argument that its alleged conduct is protected by the *Noerr-Pennington* doctrine.

example, those with respect to contestability and cancellation based on genericness. *See, e.g.*, Counterclaim III ¶¶ 84, 85, 98 in Proposed Am. Answer & Counterclaims. WRB's arguments in opposition to the DAMM Defendants' motion are limited to the proposed MUDTPA and § 1120 claims. WRB has not separately addressed the DAMM Defendants' proposed "Statement of WRB's Fraud" or other amendments. *See also supra* nn. 14-15. Therefore, except as expressly denied herein, the DAMM Defendants' motion is granted with respect to the remaining amendments. [17]

## IV. ORDER

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The DAMM Defendants' Motion to Compel, ECF No. 43, is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

2. All supplementation shall occur within 21 days of the date of this Order.

3. Each party shall bear its own costs and attorney fees in connection with the DAMM Defendants' motion to compel

4. WRB's Motion to Compel Discovery, ECF No. 50, is **DENIED AS MOOT**.

---

[17] In a recent letter to the Court, the DAMM Defendants request leave to add Martin as a party, asserting "Martin has acted as the alter ego of [WRB] in relation to WRB's fraud, and the deposition of . . . Martin on October 25th revealed additional facts supporting those allegations." ECF No. 100 at 2. WRB opposes the request on grounds of timeliness. *See generally* ECF No. 101.

The DAMM Defendants' request is denied. The deadline for motions to amend the pleadings was May 1, 2022. ECF No. 31 at 3; *see also* ECF No. 95 at 3. As discussed above, the instant motion to amend and proposed amended pleading contain specific allegations as to how Martin was purportedly involved in the alleged fraud. *See, e.g.*, Defs.' Mem. in Supp. of Amend. at 17-20; Statement of WRB's Fraud ¶¶ 30-34, 37-39, 56-58, 60-64, 67, 69-71, 73, 79, 82-84, 88-94, 97, 99-101, 103-07 in Proposed Am. Answer & Counterclaims. Yet, the DAMM Defendants did not move to add Martin as a defendant. "When the district court has filed a Rule 16 pretrial scheduling order, it may properly require that good cause be shown for leave to file an amended pleading that is substantially out of time." *Leftwich ex rel. Leftwich v. Cty. of Dakota*, 9 F.4th 966, 976 (8th Cir. 2021) (quotation omitted); *see Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008) ("When a party seeks to amend a pleading after the scheduling deadline for doing so, the application of Rule 16(b)'s good-cause standard is not optional."). Should the DAMM Defendants wish to add Martin as a defendant in this litigation, they must file a proper motion.

5. The DAMM Defendants' Motion for Leave to Amend Their Answer and Counterclaims, ECF No. 63, is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

6. The DAMM Defendants shall file their amended answer and counterclaims within 7 days from the date of this Order.

7. All prior consistent orders remain in full force and effect.

8. Failure to comply with any provision of this Order or any other prior consistent Order shall subject the non-complying party, non-complying counsel and/or the party such counsel represents to any and all appropriate remedies, sanctions and the like, including without limitation: assessment of costs, fines and attorneys' fees and disbursements; waiver of rights to object; exclusion or limitation of witnesses, testimony, exhibits and other evidence; striking of pleadings; complete or partial dismissal with prejudice; entry of whole or partial default judgment; and/or any other relief that this Court may from time to time deem appropriate.

Dated: December___22___, 2022          _____*s/ Tony N. Leung*_____
                                       Tony N. Leung
                                       United States Magistrate Judge
                                       District of Minnesota


                                       *WRB, Inc. v. DAMM, LLC et al.*
                                       Case No. 21-cv-1899 (NEB/TNL)